1                   UNITED STATES DISTRICT COURT

2                     DISTRICT OF MINNESOTA

3      ---------------------------------------------------------------

4      United States of America,        Case No. 13-cr-130 (ADM/JJG)

5              Plaintiff,               EXCERPT

6        vs.
                                        St. Paul, Minnesota
7      Buford Braden Rogers,            Courtroom 3B
                                        July 23, 2013
8              Defendant.               10:30 a.m.

9      ---------------------------------------------------------------

10                 BEFORE THE HONORABLE JEANNE J. GRAHAM

11          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12

13

14                          EXCERPT:

15       EVIDENTIARY HEARING ON PRETRIAL MOTIONS OF DEFENDANT

16              AND THE STAR TRIBUNE MEDIA COMPANY

17

18

19

20

21

22

23
       **DIGITAL RECORDING TRANSCRIBED BY:**
24     Official Court Reporter:  Heather Schuetz, RMR, CRR, CCP
                                 U.S. Courthouse, Ste. 146
25                               316 North Robert Street
                                 St. Paul, Minnesota 55101

Heather A. Schuetz, RMR, CRR, CCP
(651) 848-1223
Heather_Schuetz@mnd.uscourts.gov

1                              APPEARANCES

2     **For the Plaintiff:**

3                                    Andrew R. Winter, Esq.
                                     United States Attorney's Office
                                     300 S. 4th St.
4                                    Ste. 600
                                     Minneapolis, MN 55415

5

6     **For the Defendant:**

7                                    Andrew H. Mohring, Esq.
                                     Office of the Federal Defender
                                     107 U.S. Courthouse
8                                    300 S. 4th St.
                                     Minneapolis, MN 55415

9

10    **For the Movant, Star Tribune Media Company, LLC:**

11                                   John P. Borger, Esq.
                                     Faegre Baker Daniels, LLP
12                                   90 S. 7th St.
                                     Ste. 2200
13                                   Minneapolis, MN 55402-3901

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X :                    Page:

 2   Motion to intervene by Mr. Borger.................... 5
           Granted by the Court......................... 6
 3
     Motion to un-seal by Mr. Borger..................... 7
 4
     Closed courtroom proceedings in re motion to seal..... 9
 5         Court's ruling................................. 9

 6   Witness:  FBI special Agent Shane Ball
     Direct examination by Mr. Winter..................... 11
 7   Cross examination by Mr. Mohring..................... 33
     Redirect examination................................ 66
 8   Recross examination................................. 74
     Continued redirect examination...................... 79
 9   Continued recross examination....................... 80

10   Non-dispositive Motions
     By Mr. Mohring...................................... 82, 85
11   By Mr. Winter....................................... 84

12   Argument in re sealing and/or redacting transcripts/exhibits
     By Mr. Kovats....................................... 85
13   By Mr. Borger....................................... 87
     By Mr. Mohring...................................... 89, 95
14   Court's ruling...................................... 90, 95

15   Briefing schedule set by Court...................... 93

16

17

18                      E X H I B I T S              Page:

19   Government's Exhibits:
     1 - Search Warrant.................................. 14
20   2 - Video of the interview of Defendant............. 20
     3 - Transcript of interview of Defendant............ 24
21   4 - FBI Advice of Rights form....................... 28

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                      IN OPEN COURT

 3                     (10:30 a.m.)

 4          THE COURT:  -- there has also been a motion to

 5   intervene.  May I have appearances, please?

 6          MR. WINTER:  Morning, Your Honor, Andrew Winter and

 7   Charles Kovats appearing on behalf of the United States.

 8          THE COURT:  Hello.

 9          MR. MOHRING:  Andrew Mohring on behalf of

10   Mr. Rogers.

11          THE COURT:  Hello.

12          MR. BORGER:  John Borger on behalf of the Star

13   Tribune.

14          THE COURT:  Okay, Mr. Borger, we're not going to do

15   anything on the motion to intervene yet until I determine that

16   there is a need to do so.  I need to find out where the

17   parties are with everything, so I'm not going to have you do

18   any argument at this point.  But we do have pretrial motions

19   that have been filed.  And we have some witness testimony, so

20   I normally go ahead with the witness testimony.  Are we ready

21   to proceed with that?

22          MR. WINTER:  We are, Your Honor.

23          THE COURT:  Okay.  Mr. Mohring?

24          MR. MOHRING:  Yes, Your Honor.

25          THE COURT:  All right.
```

```
 1              MR. MOHRING:  Actually, could I have just a minute?

 2         THE COURT:  Sure.

 3         UNIDENTIFIED MALE:  Can we approach, Your Honor?

 4         THE COURT:  You may.

 5         (Off-the-record discussion held at bench.)

 6         THE COURT:  All right.  It is my understanding that

 7    there is a request to at least have a portion of what even

 8    will be some testimony to be under seal or closed.  So at this

 9    point -- so already, Mr. Borger, we have risen to the point

10    where it seems to me that we need to follow through regarding

11    the motion to intervene.  So, there has been a motion to

12    intervene by the Star Tribune with regard to sealed documents.

13    What I'll be doing is just first addressing the motion to

14    intervene, so if you can come on up and state your name again

15    for the record and your appearance, and then you can make your

16    arguments regarding your motion to intervene.  And then I'll

17    hear from the other parties regarding the motion to intervene.

18         MR. BORGER:  Thank you, Your Honor, John Borger from

19    Faegre Baker Daniels on behalf of the Star Tribune.  We have

20    filed a motion to intervene for very limited purposes.  We're

21    not interested in getting involved in the merits of the

22    proceeding at all, simply intervening for purposes of

23    advocating in favor of open court proceedings and open access

24    to documents that have been filed as court records.

25              We've set out the authorities for that position in
```

1    our memorandum.  There has seldom been an issue granting that

2    sort of motion in the past in this Court or elsewhere around

3    the country and, absent objection to which I could speak, I

4    would ask the Court to grant the motion to intervene for those

5    limited purposes.

6              THE COURT:  Okay.  Is there any -- are there any

7    statements with regard to the motion to intervene, not as to

8    the necessity for it but -- for the sealing, but for the

9    motion to intervene.

10             MR. MOHRING:  No, thank you, Your Honor.

11             THE COURT:  All right.  Anything from the other

12   side?

13             MR. WINTER:  No, Your Honor.

14             THE COURT:  All right.  I will grant the motion to

15   intervene.  That means that the procedure now will be that I

16   will certainly give the Movant a reasonable opportunity to

17   state the objections, and then what I'll be doing is for a

18   brief period closing the courtroom so that the record can be

19   fully made as to what the positions are of the attorneys in

20   terms of sealing the -- any kind of portion or part of the

21   hearing, and then we'll come back on the record and I'll make

22   my ruling on that piece.

23             So, I realize that you just were here, but

24   Mr. Borger if you want to make any argument as to your

25   objections for sealing.

```
 1              MR. BORGER:  Thank you, Your Honor.  As set forth in
 2    our memorandum, the basic standard for a motion to close any
 3    part of the court proceedings or to seal any court record is
 4    one that recognizes a qualified First Amendment and common law
 5    right of access to those proceedings.  It is under the case
 6    law, the burden of the party seeking to close off public
 7    access to any proceeding or record to make a specific showing
 8    of the need for that closure, to identify what is going to be
 9    closed -- and again not in terms of disclosing the
10    confidential or purported-to-be-confidential material itself,
11    but certainly in broad strokes the type of material that is
12    sought to be closed off; the justification for that, including
13    the specific reason for closing it; the interest to be
14    advanced which has to be a compelling Government interest.
15    And the party seeking closure must also show to the Court's
16    satisfaction that no alternative method of protecting that
17    interest would satisfy and protect it adequately.
18              At the moment, I've heard nothing from any party
19    seeking to close this as to why they are seeking to close it,
20    what they are seeking to close, and why alternative measures
21    of protecting it would be inadequate.  So I think the burden
22    then is on the Movant to come forward, and I could then at
23    least attempt on the fly to address the specifics of that.
24              THE COURT:  Okay.  All right.  I realize that
25    it's -- kind of in any privilege or -- you know, any other
```

1    scenario where we have a request for a protective order in

2    what we call an (inaudible) case for sealing, it's a little

3    bit hard because the Movant may not know all the exact

4    details, but that's what I'm going to have to put on the

5    record.  But in order to do that and allow them to speak

6    freely, I need to do that in a closed courtroom.  There will

7    be a record of it, and then I'll make a ruling as to whether

8    there has been that showing of compelling interest.  All

9    right?

10          MR. BORGER:  Your Honor, just so I'm clear, will I

11   be permitted to attend that closed portion?

12          THE COURT:  No, you will not permitted to attend the

13   closed portion of it.

14          MR. BORGER:  Will I be able to address the adequacy

15   of -- and speak to the reasons that you are putting on the

16   record regarding the issue otherwise after you (inaudible) --

17          THE COURT:  I might allow you to do that.

18          MR. BORGER:  All right.

19          THE COURT:  All right.  So, good.  So, a little bit

20   unusual, but you all must leave in the back.  And Mr. Borger,

21   you have to, as well.  And then I'll allow the record to stand

22   as is, but this portion will be closed.  And so I want to make

23   sure the record is clear.  It's 10:39, and we're closing for a

24   showing by the parties with regard to whether it has to remain

25   to be closed.  Okay.

```
 1              (At this time Mr. Borger, attorney for the Movant,
 2     along with any and all court attendees, exit the courtroom.)
 3              (Commencing at 10:39 a.m. and concluding at 10:52
 4     a.m., a hearing was held inside a closed courtroom, the text
 5     of which is filed UNDER SEAL conventionally with the Clerk's
 6     office.)
 7              (Back on the record in open court.)
 8              THE COURT:  All right.  It appears everyone is back.
 9     It is 10:52, almost 10:53, and we're back on the open record.
10     Mr. Borger, I am going to ask you to step back and go back on
11     the other side of the bar.  I am denying the motion for
12     sealing either the documents or this hearing.
13              MR. BORGER:  Your Honor, I have just one question.
14     Will you be making the transcript of the previous hearing,
15     which you did have under seal, open --
16              THE COURT:  The previous hearing, you mean just now?
17              MR. BORGER:  The one you just held.
18              THE COURT:  No, I'm not going to allow that.  I'm
19     not going to allow that piece.  I'm denying the motion.  It
20     seems to me that if parties need to make a motion to seal and
21     need to be able to speak freely in that, that opening that up
22     then does not allow the process or the people making the
23     motion to seal to be free with what they need to tell the
24     Court, be it sufficient or not.  I find that it wasn't a
25     sufficient particularized showing for the proper compelling
```

| | |
|---|---|
| 1 | interest and narrowing of that interest and that there isn't |
| 2 | any alternative.  I found that that wasn't sufficiently shown |
| 3 | to the Court, and so I'm denying the motion to seal.  That |
| 4 | means document entries 36 to 41 will be unsealed.  And as to |
| 5 | the hearing, we'll just proceed with the hearing. |
| 6 | MR. WINTER:  Thank you, Your Honor. |
| 7 | The Government calls Special Agent Shane Ball. |
| 8 | THE COURT:  All right.  Come on up to the podium. |
| 9 | **(The witness is duly sworn and testifies under oath** |
| 10 | **as follows.)** |
| 11 | THE COURT:  Please have a seat. |
| 12 | **(Witness takes stand.)** |
| 13 | MR. MOHRING:  Your Honor, I would just ask that if |
| 14 | there are any other witnesses in the courtroom that they be |
| 15 | sequestered. |
| 16 | THE COURT:  Any other witnesses, Mr. Winter? |
| 17 | MR. WINTER:  No, Your Honor. |
| 18 | THE COURT:  All right.  If you could state your name |
| 19 | again, please, and spell your last name. |
| 20 | THE WITNESS:  Shane Ball, B-a-l-l. |
| 21 | THE COURT:  Okay.  Is Shane S-h? |
| 22 | THE WITNESS:  Yes, ma'am, S-h-a-n-e. |
| 23 | THE COURT:  Okay.  Go ahead, Counsel. |
| 24 | MR. WINTER:  Thank you, Your Honor. |
| 25 | |

```
1                    D I R E C T   E X A M I N A T I O N

2     BY MR. WINTER:

3     Q.   Let's begin by having you tell the Court a little bit

4     about what you do for a living, who you do it for, and what

5     your background is.

6     A.   Excuse me.  I'm an FBI agent, have been so for just over

7     18 years.  I'm currently assigned to the St. Cloud resident

8     agency.  St. Cloud, our kind of satellite office, we cover 20

9     counties in kind of north and western Minnesota.

10              THE COURT:  And Mr. Ball, I'm going to ask you,

11    because the microphone is set, go ahead and talk to Mr. Winter

12    because when you face me, it doesn't pick up as well.  Okay.

13    Go ahead.

14              THE WITNESS:  Yes, ma'am.

15              MR. WINTER:  We'll try to include you in the

16    conversation.

17              THE COURT:  All right.  I'm listening.

18    BY MR. WINTER:

19    Q.   All right.  So you've been an agent for 18 years.  Have

20    you worked a variety of different types of cases?

21    A.   Yes, I have.

22    Q.   And are you currently involved as a Case Agent or perhaps

23    co-Case Agent in the matter that's before the Court which is

24    United States of America versus Buford Rogers?

25    A.   Yes, sir, I am.
```

1   Q.   And are you familiar with the facts and circumstances

2   that led up to the Indictment of Mr. Rogers?

3   A.   Yes, sir.

4   Q.   And you're familiar with those because you have, fair to

5   say, participated in many aspects of the investigations, but

6   you've also communicated with other law enforcement officers

7   involved in this investigation.  Fair to say?

8   A.   Fair to say, yes, sir.

9   Q.   Now, could you explain to the Court how this case

10  originally got started, which I guess would be in late April

11  of 2013 in -- essentially in San Antonio.

12  A.   Originally the individual came into the San Antonio

13  Police Department and advised that Mr. Rogers and others were

14  potentially involved in a plot to conduct violence in and

15  around the area of Montevideo, Minnesota and that they had

16  weapons and explosives to carry out that plot.

17  Q.   Now this witness that you're referring to is who we've

18  collectively referred to as Witness Number 1?

19  A.   Yes, sir.

20  Q.   What, if anything, was done with respect to Witness

21  Number 1's follow-up on this person's initial tip, if you

22  will, to law enforcement about these potential plans?

23  A.   The initial interview with San Antonio Police Department

24  was fairly short.  We got, as quick as we could track him

25  down, we got an FBI agent from San Antonio to sit down with

1    him and do a more thorough interview.

2    Q.    And that took place approximately one day after the

3    initial report from Witness Number 1?

4    A.    Yes, sir.

5    Q.    And so that would have been on May 2nd of 2013.  Is that

6    correct?

7    A.    That is correct.

8    Q.    Following that interview, there was a -- ultimately a

9    decision to pursue a search warrant for a particular residence

10   in Montevideo, Minnesota.  Is that correct?

11   A.    That is correct.

12   Q.    And what is the residence we're talking about?  Do you

13   know the address?

14   A.    You know, as soon as you said that, the actual physical

15   address dropped out of my head.

16   Q.    All right.

17   A.    It's the trailer where the Rogers' residence, Lot

18   Number 8 --

19   Q.    Okay.  And this would be 1204 Benson Road, Lot Number 8,

20   in Montevideo, Minnesota.  Is that correct?

21   A.    That is correct.

22   Q.    You were affiant on that search warrant.  Is that

23   correct?

24   A.    That is correct.

25   Q.    But you're familiar with the document, and you're

```
1    certainly familiar with the underlying facts that were
2    provided to the Magistrate Leung in support of the search
3    warrant.  Is that correct?
4    A.   Yes, sir.
5              MR. WINTER:  May I approach the witness?
6              THE COURT:  You may.
7    BY MR. WINTER:
8    Q.   Showing you what we've got marked as motions hearing --
9    as Government's Exhibit Number 1, do you recognize this
10   document?
11   A.   I do, yes, sir.
12   Q.   And is this the application for search warrant,
13   Affidavit, and the actual search warrant itself that was
14   signed by Judge Leung on May 3rd of 2013 for that address we
15   discussed?
16   A.   Yes, sir.
17             MR. WINTER:  Offer Exhibit Number 1 for purposes of
18   this hearing, Your Honor.
19             MR. MOHRING:  No objection, Your Honor.
20             THE COURT:  All right.  For purposes of this
21   hearing, Exhibit 1 is received.
22   BY MR. WINTER:
23   Q.   How soon after the warrant was signed by Magistrate Judge
24   Leung was the warrant actually executed?
25   A.   Oh, minutes.
```

1   Q.   I'd like you to describe for the judge -- were you

2   present for the execution or at least the beginning of the

3   execution of the search warrant?

4   A.   Yes, sir, I was.

5   Q.   I'd like you to explain for the judge, first of all, what

6   time of day this took place.

7   A.   Yes, some time just after noon.

8   Q.   And tell the judge a bit about the residence to be

9   searched and then the surrounding area.

10  A.   The residence, the 1204 Benson Road residence, is a

11  trailer.  It's a trailer located in a trailer park in the city

12  of Montevideo.  There's the trailer itself, then next to the

13  trailer is a shed.  There's kind of residences on both sides,

14  kind of typical of many trailer parks that you'd see, where

15  it's a housing residential sort of area and lots of trailers

16  in that area.

17  Q.   Who, from the law enforcement side, was used in order to

18  execute the warrant?  Kind of itemize the staff, if you will.

19  A.   Yeah, there's several kind of moving components on a case

20  like this.  We used our -- the FBI SWAT Team to effect the

21  safe, secure -- securing of the facility for human threats.

22  The follow on then was the -- we brought in bomb technicians,

23  both FBI bomb technicians and from Bloomington Police

24  Department.  And then following that was our Evidence Response

25  Team folks who did a lot of the actual physical searching.

1   Q.   Now, you touched on it earlier in your testimony

2   regarding Witness 1, but if you could speak in a little more

3   detail about what Witness 1 relayed to law enforcement

4   regarding Mr. Rogers and a potential threat.

5   A.   Witness Number 1 had described a potential threat which

6   involved an attack by Mr. Rogers and/or others involving a

7   communications tower, the National Guard armory, and the

8   police department.

9   Q.   Okay.

10  A.   He described weapons and explosives that was located at

11  Mr. Rogers -- at the trailer in question and at the shed in

12  question that were to be utilized in the attack.

13  Q.   Now, are you aware of whether or not items were found

14  during the search of that location that were consistent with

15  what was described?

16  A.   Yes, sir.

17  Q.   Could you itemize in summary fashion at least what was

18  initially found at the search site?  And before you do, I have

19  one other question:  Was there any timeframe, by Witness 1,

20  put on the potential attack?

21  A.   Yes, sir.  He had described the attack of being imminent

22  that weekend.  Friday was the 3rd.  The weekend being, you

23  know, midnight, 4th.  So, it was imminent.

24  Q.   Okay.  So back to explaining for the judge what was

25  actually found at least initially at the search site?

```
1    A.    Pretty quickly upon securing of the trailer and then the
2    shed of human threats, just the tactical part of it, the bomb
3    techs and searchers were able to locate or quickly located two
4    incendiary devices, Molotov cocktail-type devices and then a
5    couple of what appeared at the time to be explosive devices.
6    Q.    And the explosive devices worked -- how did they appear
7    to the bomb techs at least initially?
8    A.    Initially they were, you know, sort of containerized,
9    wrapped in duct tape -- one was wrapped in cloth, the other
10   one wrapped in duct tape, fuse coming out of them.
11   Q.    Okay.  What, if anything, was done at the scene with
12   those devices, to either examine or secure them?
13   A.    Um, the bomb techs have a whole number of steps that they
14   go through when they find an explosive device.  In this case,
15   several of the devices were x-rayed, and you could see
16   shrapnel inside or what appeared to be shrapnel inside based
17   on the x-ray.  At the time -- and this takes a while, this is
18   not a moment by moment thing, but it takes a while.  There's a
19   process they go in in which they take those devices, remove
20   them from the area, and then render them safe.
21   Q.    Okay.  And so you had mentioned Molotov cocktails.
22   A.    Yes, sir.
23   Q.    And just -- what is a Molotov cocktail?
24   A.    Various definitions, but in -- it's an incendiary device
25   generally in a glass-type model with a wick of some sort.
```

1    Generally speaking it would be gasoline and then some other

2    substance in there.  There can be various other substances

3    mixed in with the gasoline, many different varieties.

4    Q.   Okay.  And perhaps you touched on this, but were there

5    any guns or ammunition found at the search site?

6    A.   Yes, sir.

7    Q.   Approximately how many?

8    A.   Oh, um, many.  Eight or ten probably.

9    Q.   All right.  And ammunition, as well?

10   A.   Yes, sir.

11   Q.   At the time this was taking place, were there any efforts

12   by law enforcement to locate Mr. Rogers, who was not located

13   at the search site at the time of the warrant's execution,

14   correct?

15   A.   Correct, yes, sir.

16   Q.   And so agents were looking for him.  Is that correct?

17   A.   That is correct.

18   Q.   And are you aware of whether or not he was found some

19   place nearby?

20   A.   He was.  He ended up returning to his -- the other

21   residence in town, in Montevideo.

22   Q.   And what happened at that point?

23   A.   At that point other agents made contact with him and

24   brought him to the Montevideo Police Department.

25   Q.   Okay.  And he was placed in custody prior to being

1   transported.  Is that fair to say?

2   A.   Yes, sir, he was put in handcuffs.

3   Q.   Were you then informed of the fact that Mr. Rogers was

4   now in custody?

5   A.   Yes, sir.

6   Q.   And what was in your mind at that point in time?  What

7   was your next step?

8   A.   The next step is to get to Mr. Rogers as quick as we

9   could.

10  Q.   For what purpose?

11  A.   We needed to talk to Mr. Rogers to try to ascertain, you

12  know, what other explosives are out there, the bigger plot,

13  kind of all the other pieces that are involved here.

14  Q.   Okay.  Did you then leave the search site immediately

15  upon learning that he was in custody?

16  A.   Yes, sir.

17  Q.   And where did you go then?

18  A.   Montevideo Police Department.

19  Q.   Explain then what occurred at the Montevideo police

20  station with respect to your interactions with Mr. Rogers.

21  A.   Um, I got together with Chief Adam Christopher, who is

22  the Chief of Police of the Montevideo Police Department.  We,

23  for just a moment, speak before we went in the room.  Went in

24  the room, introduced myself to Mr. Rogers.

25  Q.   And describe this room.  Is it a jail cell?

```
 1    A.    No, it's an interview room, typical of interview rooms in
 2    police departments everywhere.
 3    Q.    Okay.  Are you aware of whether or not it had the
 4    videotape capability?
 5    A.    Yes, sir.
 6    Q.    And was the interview that you're about to describe,
 7    start to finish, was that recorded on a videotape?
 8    A.    Yes, sir.
 9    Q.    And you brought -- you provided us with a copy.  And I'm
10    showing you what -- if you can probably see it, it's been
11    marked as Government Exhibit Number 2.  Is this a fair and
12    accurate copy of that videotape of that interview that you're
13    about to talk about?
14    A.    Yes, sir.
15    Q.    All right.
16          MR. WINTER:  For purposes of today's hearing, we're
17    offering Government Exhibit Number 2, Your Honor.
18          MR. MOHRING:  No objection, Your Honor.
19          THE COURT:  Okay.  Exhibit 2 is received for this
20    hearing.
21          (The Court is handed a document.)
22          THE COURT:  Thank you.
23    BY MR. WINTER:
24    Q.    And before we move on, there's no question in your mind,
25    is there, that Mr. Rogers at this point in time was not free
```

1    to leave, correct?

2    A.    That is correct.

3    Q.    He was in custody?

4    A.    Yes, sir.

5    Q.    Okay.  Who was present throughout the interview, the

6    personnel other than Mr. Rogers?

7    A.    Myself and Chief Christopher.

8    Q.    Would you describe for the Court what you recall about

9    Mr. Rogers' demeanor throughout the interview.  How would you

10   describe his demeanor?

11   A.    I would describe Mr. Rogers as being fairly calm.

12   Mr. Rogers is an articulate guy.  He was engaged in the

13   conversation, seemed to be coherent.

14   Q.    In your 18-plus years of law enforcement, have you had

15   opportunities to deal with people who are under the influence

16   of alcohol or drugs?

17   A.    Yes, sir.

18   Q.    Based on that training and experience, did you have an

19   impression as to whether or not at the time you conducted this

20   interview Mr. Rogers appeared to you to be under the inference

21   of any kind of alcohol or drugs?

22   A.    He did not appear to be under the influence of anything.

23   Q.    Was Mr. Rogers responsive to your questions in terms of

24   did he understand what you were asking and then answer in a

25   way that was responsive to those questions?

1    A.    Yes, sir, he did.

2    Q.    Was he tracking?

3    A.    Yeah, and when he wasn't, he would clarify.

4    Q.    Okay.  Did he appear to be emotionally stable or somehow

5    distraught in any fashion?

6    A.    No, he was pretty calm.

7    Q.    Okay.  What about fatigue?  Did he appear tired to you or

8    not?

9    A.    Did not appear to be.

10   Q.    Do you know or recall approximately -- or more than

11   approximately -- how old Mr. Rogers is?  Do you know his age?

12   A.    Um, it's funny, you get up here and you forget dates.  I

13   think he's late 20s.

14   Q.    Okay.  Throughout the interview, did you or any other law

15   enforcement personnel that you're aware of threaten the

16   Defendant in any fashion in order to get information from him?

17   A.    No, sir.

18   Q.    Okay.  What was the length of the interview, start to

19   finish, including the breaks, I believe, that you'll talk a

20   little bit about later in your testimony?

21   A.    Including the breaks, probably over three hours.

22   Q.    Okay.  What time of day did this interview start?

23   A.    Mid-afternoon.

24   Q.    And if you could -- you may need to think about this --

25   but how long after his actual -- being taken into custody for

1    the interview, from that point in time to the actual beginning

2    of the interview, do you know what time span you're talking

3    about there?

4    A.    Oh, probably 10 minutes, approximately.

5    Q.    Were there breaks taken during the course of the

6    three-hour interview?

7    A.    Yes, sir.

8    Q.    Okay.  Do you recall approximately how many?

9    A.    I specifically recall two.  There may have been a third.

10   Q.    Okay.  And those would all be evident from the exhibit

11   that we've tendered to the Court.  Is that correct?

12   A.    Yes, sir.

13   Q.    At any time from the beginning of the interview to the

14   very end of the interview did he ever ask for an attorney?

15   A.    No, sir.

16   Q.    Did he ever indicate to you that he didn't understand

17   what was happening, like he was confused?

18   A.    No, sir.

19   Q.    Did he ever tell you something along the lines of, "Hey,

20   I'm sick of your questions.  I don't want to answer any more

21   of these questions"?  Anything like that?

22   A.    No, sir.

23   Q.    Was he offered or did he ask for any kind of break for

24   bathroom, food, water, smoking, anything like that?

25   A.    No, he was offered and accepted both water and bathroom.

1   Q.   Okay.  And again would those be evident on Exhibit No. 2?

2   A.   Yes, sir.

3   Q.   Was he informed in some fashion of the purpose of the

4   interview, why you guys were there, why you were talking to

5   him?

6   A.   Yeah.  He was advised of that on numerous occasions.

7   Q.   Now, the videotape was transcribed by your agency.  Is

8   that correct?

9   A.   Actually it was transcribed by the Montevideo Police

10  Department.

11  Q.   Oh, all right.  And you've had a chance to look at what

12  I've got marked as Government Exhibit Number 3, which is a

13  transcript of that interview.  Is that right?

14  A.   Yes, sir.

15  Q.   And is this a fair and accurate copy of the transcription

16  that was done in this particular case?

17  A.   Yes, sir.

18  Q.   All right.

19       MR. WINTER:  I'm going to offer Government Exhibit

20  Number 3 for purposes of their hearing, Your Honor.

21       MR. MOHRING:  No objection for present purposes,

22  Your Honor.

23       THE COURT:  All right.  Exhibit 3 received.

24  BY THE STATE:

25  Q.   And is it fair to say on Exhibit 3 there are certain

1   inaudibles or things that are written down as inaudibles that

2   are susceptible to hearing when you actually watch the

3   videotape?

4   A.   Yes, sir.  The videotape is the most true and accurate

5   representation.

6   Q.   Okay.  Now moving on, at the outset of the interview, did

7   you provide Mr. Rogers with his *Miranda* rights advisory?

8   A.   I did not.

9   Q.   Okay.  And why did you not *Miranda*ize him at the outset

10  of this interview?

11  A.   We utilized the public safety exception, specifically

12  because we had solid information that a plot was in the works,

13  that an individual had weapons, explosives, and knowledge,

14  wherewithal, those things, in order to commit a plot.  When we

15  arrived at the scene, we found weapons and explosives,

16  incendiary devices consistent with what we found.  So, at that

17  time the bigger, overriding factor of what we're doing that

18  day was to establish the -- how many devices are there, how

19  many weapons are there, what's out there, is he capable of

20  committing these sort of acts, are there any other

21  co-conspirators, types of devices, how are they triggered,

22  what are the mechanisms, those sorts of things.

23  Q.   Okay.  And were your questions then asked in this initial

24  portion of the interview designed to obtain that information?

25  A.   Yes, sir.

1    Q.   All right.  And again, with respect to what you would do

2    with that information, what was the ultimate end gain?

3    A.   At that point I have searchers, bomb technicians at the

4    house.  There's also a fair amount of neighbors in that

5    neighborhood.  There's weapons and explosives in that shed

6    certainly, later in the house, as well.  We are very much

7    concerned about somebody getting hurt.

8    Q.   Okay.  And you were trying to obtain as much information

9    as possible to eliminate that possibility?

10            MR. MOHRING:  Objection.  Leading at this point,

11   Your Honor.  Non-foundational.

12            THE COURT:  Sustained.  Sustained.

13            MR. WINTER:  Okay.  I'll withdraw.

14   BY MR. WINTER:

15   Q.   So this first portion of the interview lasted

16   approximately how long, meaning how much later did you then

17   move into a formal rights advisory and then a continued

18   questioning of Mr. Rogers?

19   A.   It was approximately 40 minutes.

20   Q.   And just to help the Court a little bit at the beginning

21   of Exhibit 2, which is the videotape, is the tape running but

22   there's no interview actually taking place.  Correct?

23   A.   Correct.

24   Q.   And that lasts a number of minutes, six, seven minutes.

25   Does that sound right?

1   A.   Yes, sir.

2   Q.   Okay.  During the public safety portion of the interview,

3   did Mr. Rogers immediately come clean and tell you everything

4   about those devices that were found?

5   A.   No, sir.

6   Q.   All right.  At the point that you then moved into a

7   formal rights advisory, do you recall this portion of the

8   interview?

9   A.   I do.

10  Q.   How was it that you advised him of his rights?  Do you

11  have any kind of form or a card?  Some officers use a card to

12  read rights.  How do you do it?

13  A.   The FBI uses a standard -- it's an FD395, a standard

14  Advice of Rights form that I read aloud to him.

15  Q.   Okay.  And again this would be evident on Exhibit 2?

16  A.   Yes, sir.

17  Q.   And did you bring a copy of the Advice of Rights form

18  that you filled out during this interview with Mr. Rogers?

19  A.   I provided you a copy.

20  Q.   Yes.

21  A.   Yes, I did.

22  Q.   And that's what I've got marked as Government

23  Exhibit Number 4.  Does that look familiar?

24  A.   Yes, sir.

25  Q.   All right.

1        MR. WINTER:  Offer Exhibit No. 4 for purposes of

2   this hearing.

3        MR. MOHRING:  No objection for present purposes,

4   Your Honor.

5        THE COURT:  Exhibit 4 received.

6   BY MR. WINTER:

7   Q.   And on the form, it -- on the form, Mr. Rogers' signature

8   doesn't appear there but rather a notation that says "verbal."

9   Can you explain to the Court what that means?

10  A.   Yes, sir, I had written "verbal" on there.  He was in

11  handcuffs at the time, and I'd written "verbal" after getting

12  a notification from him that he agreed and was willing to

13  continue.

14  Q.   Okay.  And then you signed it yourself.  Is that correct?

15  A.   That is correct.

16  Q.   And you had it witnessed by who?

17  A.   Chief Christopher, who was also in the room.

18  Q.   And you can actually see Chief Christopher in the video;

19  he's sitting next to you.  Correct?

20  A.   Yes, sir.

21  Q.   All right.  Did Mr. Rogers appear to you, based on your

22  experience, to understand the rights as you read them to him?

23  A.   Uh, yes, sir, he did.

24  Q.   Okay.  Did he have any questions for you about his

25  *Miranda* rights?

1   A.   He did.  He commented on the fact that the form that I

2   had read to him and that he had read himself was slightly

3   different than one he had previously been provided, so we

4   discussed that for a minute.

5   Q.   Okay.  Did there appear to be, on his part, any confusion

6   about what his rights were?

7   A.   No.

8   Q.   Did he then acknowledge those rights and waive them

9   during the course of this interview?

10  A.   Yes, sir.

11  Q.   And following that waiver, did he then continue to answer

12  questions that you posed to him about the facts and

13  circumstances?

14  A.   Yes, sir.

15  Q.   All right.  Now that second half, that post-*Miranda*

16  interview, that's approximately how long or how much of that

17  three-hour interview?

18  A.   Oh, it's probably another two hours-ish.

19  Q.   And it's during that second portion, is it not, that you

20  take a couple of breaks?

21  A.   Yes, sir.

22  Q.   And the duration of those breaks are roughly what, if you

23  recall?

24  A.   Um, probably 20ish minutes.

25  Q.   Can you describe for the Court how the interview ends.

1    What brings it to an end?

2    A.   I end up getting called away and have to step out to deal

3    with some investigative issues related to the house.  And then

4    DNR Officer Peach is with him, and then he ends up being

5    transferred to the Sheriff's office.

6    Q.   And I forgot to ask, did the topic of *Miranda* rights ever

7    come up following his waiver of the *Miranda* rights on that

8    form and with your initial discussion?

9    A.   Yes, sir.  After the first break -- um, approximately 20

10   minutes, I can't remember exactly -- I came back in the room

11   and just said, "Hey, remember we talked about your advice of

12   rights?  We went through that form.  All that still stands."

13   And he commented that he understood.

14   Q.   Following completion of this interview and after the dust

15   had settled, so to speak, on the initial search warrant and

16   arrest, did you have an opportunity to review some information

17   provided to you by the Montevideo Police Department about

18   instances where Mr. Rogers has had *Miranda* rights read to him

19   on prior occasions?

20   A.   Yes, sir.

21   Q.   And I believe you found or were provided two different

22   instances where that took place.  Is that correct?

23   A.   That is correct.

24   Q.   Could you just describe for the Court what you listened

25   to and the context and the dates.

```
1              MR. MOHRING:  Your Honor, I would object to the
2     relevance at this point.  I'm aware of no authority that would
3     suggest that previous advice of rights is relevant to a
4     situation or custodial interrogation.
5              MR. WINTER:  There is authority that prior
6     experience with Miranda warnings goes to a knowing and
7     intelligent waiver of Miranda rights in a given situation.
8              MR. MOHRING:  I don't -- there's been testimony
9     about the perception of a knowing and intelligent waiver.  I
10    don't think that this informs that question --
11             THE COURT:  I'm going to sustain the objection for
12    now, wait until after cross to see if that arises based on the
13    cross.
14             MR. WINTER:  Okay.  All right.  And will you give us
15    an opportunity to re-address this at a later time?
16             THE COURT:  After cross, yes.
17             MR. WINTER:  Okay.  Thank you.
18    BY MR. WINTER:
19    Q.   Are you familiar with the circumstances where Mr. Rogers
20    was booked into the United States Marshal Service?
21    A.   Yes, sir.
22    Q.   And how are you familiar with those circumstances?
23    A.   I was the one who did that.
24    Q.   And just describe when that took place and where.
25    A.   It was the next Monday morning, so I think that would be
```

1    the 6th.

2    Q.   And what facility, what building, where was he brought?

3    A.   Brought to the United States Marshal Service in St. Paul.

4    Q.   All right.  At the time he's booked in, was he -- can you

5    explain the process for booking in and what your role is when

6    you're booking in a prisoner?

7    A.   Yeah.  When we're bringing a prisoner up to the Marshal

8    Service, you bring them up, you fill out this form, and then

9    basically turn them over.  Then you have to come back for the

10   initial appearance, which is generally 2:00.

11   Q.   As part of that booking process, are you required to ask

12   him a number of questions about himself and biological data

13   and information?

14   A.   Yes, sir.

15   Q.   Is one of those questions about whether or not they take

16   any medication?

17   A.   Yes, sir.

18   Q.   And was that question asked of Mr. Rogers?

19   A.   It was.

20   Q.   And obviously there's no *Miranda* warning prior to these

21   questions being put to him.  Is that fair to say?

22   A.   That is correct.

23   Q.   And do you recall whether or not he indicated to you and

24   the booking deputy that he, in fact, took some migraine

25   medication?

1   A.   That is correct.

2   Q.   Okay.  And was that question in any fashion in your mind

3   designed to elicit an incriminating response from him?

4   A.   No, sir.  That's one of the questions on the form.

5   Q.   Okay.

6         MR. WINTER:  All right.  At this time, I have no

7   further questions, Your Honor.

8         THE COURT:  Okay.  Mr. Mohring.

9         MR. MOHRING:  Thank you, Your Honor.

10         THE COURT:  Cross exam on behalf of Mr. Rogers.

11              C R O S S    E X A M I N A T I O N

12   BY MR. MOHRING:

13   Q.   Morning, Agent.

14   A.   Morning.

15   Q.   Just to start where you ended, when -- it was you who

16   asked Mr. Rogers about whether he took any medication?

17   A.   Yes, sir.  There's a -- we have to ask them information

18   related to the booking sheet that the Marshals fill out.

19   Q.   You asked the questions?

20   A.   Yes, sir.

21   Q.   And he answered about migraine medication?

22   A.   Yes, sir.

23   Q.   Did he say anything else in response to that question?

24   A.   Um, yeah, just insomuch as that it's not a medication he

25   has to take every day; it's a medication that he has to take

1    during certain, I guess, onsets of migraine headaches.

2    Q.   Is it fair -- what I'm getting at, is it -- the

3    statements that Mr. Rogers made to you relating to the charges

4    that he's now facing, to the investigation that you were

5    involved in last May, were those statements contained in the

6    interrogation that happened at the Montevideo Police

7    Department that is the subject of the tape and the transcript

8    that have been admitted?

9    A.   I'm not completely --

10   Q.   Let me re-ask.  Was he questioned in the context of this

11   investigation apart from the interrogation at the Montevideo

12   Police Department?

13   A.   He was not.

14   Q.   Did he make statements in connection with the

15   investigation apart from the statements that he made at the

16   Montevideo Police Department on tape?

17   A.   No, sir.

18   Q.   All right.  I think -- I've not heard of co-Case agents,

19   but I think you identified yourself or the prosecution

20   identified you as a co-Case Agent in this case?

21   A.   I think he asked if I was a Case Agent or the co-Case

22   Agent.  I'm the Case Agent on the case.

23   Q.   You are the Case Agent?

24   A.   Yes, sir.

25   Q.   There's no co-Case Agent, to your knowledge?

1   A.   Co-Case Agent is one of those terms where there's a

2   number of people -- I guess my partner would be probably

3   theoretically my co-Case Agent on this.  Various -- we help

4   each other on various cases.

5   Q.   Who is that?

6   A.   Who would be the co-Case?

7   Q.   Yeah.

8   A.   Various people helped on this matter but I guess, you

9   know, Chad Schliepsiek is my partner at the St. Cloud RA.

10  Q.   He is also a Special Agent with the FBI?

11  A.   Yes, sir.

12  Q.   Okay.

13          THE COURT:  Can you spell his last name, please?

14          THE WITNESS:  Uh, I will try.

15  S-c-h-l-i-e-p-s-e-i-k.

16          THE COURT:  Okay.  Thank you.  Go ahead, Counsel.

17  BY MR. MOHRING:

18  Q.   And was that individual present during the execution of

19  the search warrant?

20  A.   He was in Montevideo.  He was not present at the

21  execution of the search warrant, but he was present at first

22  contact with Mr. Rogers.

23  Q.   I believe your testimony was that your involvement in

24  this case began in, what, days before the search was executed?

25  A.   No.  My involvement --

1   Q.   Go ahead.  Where did your involvement in the

2   investigation begin?

3   A.   I would say probably a year prior to that.

4   Q.   All right.  The search warrant was based on information

5   that was ultimately received by the FBI the day before the

6   warrant was executed?

7   A.   Correct.

8   Q.   But the investigation started before that?

9   A.   Yes, sir.

10  Q.   And you participated in that?

11  A.   Yes, sir.

12  Q.   As the -- as a co-Case Agent or the Case Agent, you have

13  access to all the reports that the FBI has prepared in

14  connection with this investigation, yeah?

15  A.   Yes, sir.

16  Q.   Those reports indicated a full investigation initiated

17  October 16th, 2012.  Does that sound about right?

18  A.   That's about right.

19  Q.   Did your involvement begin before that?

20  A.   Only insomuch as prior to a previous arrest of

21  Mr. Rogers, I had had conversations with the Montevideo Police

22  Department about Mr. Rogers, but there was no sort of official

23  investigation or anything at that time.

24  Q.   Any preparation of any search warrants during that

25  timeframe?

1    A.   Well, the Montevideo Police Department did some

2    investigative work, but I was not a part of any of that.

3    Q.   All right.  At least as far as the federal investigation

4    of the charges in this case, is it fair to say that the search

5    warrant was prepared based on the information that you all

6    received the day before?

7    A.   Yes, sir.

8    Q.   There was no -- nothing underway at that point before you

9    received that information?

10   A.   No -- no.  Sorry.

11   Q.   And that information you've already testified about, that

12   information was at least part of the Affidavit that was

13   offered in support of the search warrant.  Right?

14   A.   Yes, sir.

15   Q.   In fact, it was the only information within a timeframe

16   of a month or more of the search warrant that was offered in

17   the Affidavit.

18   A.   Well, there was a second -- in the Affidavit, there was a

19   second witness that was referenced.  I'm not sure if that's

20   where you're --

21   Q.   But that witness talked about stuff that happened months

22   before, right?

23   A.   Some time prior.

24   Q.   The only current information, the only recent information

25   that was offered in support of the search warrant, though, was

1    information that came from this individual, Witness Number 1?

2    A.    Yes, sir.

3    Q.    And as you've testified, that witness provided

4    information about the possibility of explosives being used in

5    the community?

6    A.    Yes, sir.

7    Q.    Did you receive information about the possibility of

8    explosives being used in the community by Mr. Rogers from

9    anybody else?

10   A.    Directly, no.

11   Q.    The only individual, then, that provided you information

12   that gave rise to the warrant and the public safety concerns

13   was this guy.  Right, Witness Number 1?

14   A.    That is correct.

15   Q.    Are you familiar with the distinction between

16   confidential informant and a confidential reliable informant,

17   as those terms are used in search warrants, say?

18   A.    I am familiar with the terms.

19   Q.    And so the difference is that a confidential reliable

20   informant is somebody who had, in the past, provided

21   information that had turned out to be reliable.  Right?

22   A.    Yes, sir.

23   Q.    Was this -- did that apply to this case?  Had this

24   individual, Witness Number 1, provided information to the FBI

25   or other law enforcement in the past before, I guess, May 1st

1   and May 2nd, that had turned out to be reliable?

2   A.   I'm in no way, shape, or form trying to be argumentative,

3   so just bear with me.  Not an informant situation, a witness

4   off-the-street situation.  We had no relationship with this

5   individual prior.  There was no -- we weren't directing him,

6   there was no sort of -- that relationship didn't exist here.

7   This is a citizen who came forward with information, so it's

8   slightly different.

9   Q.   Okay.  Let me ask the question again.  Had the citizen

10  who came forward with information in the past provided

11  reliable information to law enforcement?

12  A.   Not to my knowledge.

13  Q.   The individual, Witness Number 1, indicated both to the

14  police and to the FBI that he had left Minnesota on

15  April 29th?

16  A.   Correct.

17  Q.   And do you know based on your investigation whether

18  that's accurate?

19  A.   I believe that to be accurate, certainly within the same

20  timeframe.

21  Q.   All right.  Now, the prosecution asked you about

22  information or evidence that the witness told you about that

23  was found.  I want to ask about the reverse.  Let me get the

24  Affidavit.  Do you have the exhibits in front of you?

25  A.   I do not.

```
1              THE COURT:  Here they are.

2              MR. MOHRING:  Does the Court have a copy?  I don't

3    want to take your only one.

4              THE COURT:  That's okay.  I'll be reviewing it a lot

5    later, and I'm not going to do the DVD right at the moment --

6    or the CD.  I'll just give you the paper.

7              MR. MOHRING:  Let me go look for my copies now and

8    see what I have --

9              THE COURT:  Okay.  All right.

10   BY MR. MOHRING:

11   Q.   The witness told agents about homemade napalm, did they

12   not?

13   A.   Yes, sir.

14   Q.   Was there any homemade napalm found during the search?

15   A.   Yes, sir.

16   Q.   Apart from the Molotov cocktails?

17   A.   Apart from?

18   Q.   Right.

19   A.   No, sir.

20   Q.   The witness talked about homemade thermites.  Yes?

21   A.   Yes.

22   Q.   Thermite is an explosive?

23   A.   No, it is not.

24   Q.   What is it?

25   A.   Thermite -- and I'm not a chemist, so just bear with my
```

1    layman's terms.  Thermite is a burning -- it's a chemical

2    compound that's used to burn items, to burn through items,

3    burn through metal, that sort of thing.

4    Q.    And was that found during the search?

5    A.    There was, um, bags that Mr. Rogers described in the

6    interview of thermite components in the house.

7    Q.    Things from which something like this could be made?

8    A.    Correct.

9    Q.    And the witness also talked about C4?

10   A.    Yes, sir.

11   Q.    As something that was there?

12   A.    Yes, sir.

13   Q.    Was any found?

14   A.    We did not find any.

15   Q.    You identified a number of different law enforcement

16   agencies and subagencies that were involved in the search on

17   May 3rd.  Do you recall your testimony?

18   A.    Yes, sir.

19   Q.    There were a number of different subparts of the FBI who

20   were represented.  Right?

21   A.    Yes, sir.

22   Q.    At least one Special Agent from the Bureau of Alcohol,

23   Tobacco, and Firearms?

24   A.    Yes, sir.

25   Q.    Bloomington police officers also present?

1    A.    Yes, sir.

2    Q.    And I don't think you testified, but there were also

3    Montevideo Police Department officers present when the search

4    was executed --

5    A.    As well as Chippewa County sheriff deputies and DNR.

6    Q.    Can you estimate how many people all total?

7    A.    I'm going to estimate in the neighborhood of 50.

8    Q.    And I'll -- obviously they didn't all come in one car.

9    Multiple law enforcement vehicles also?

10   A.    Yes, sir.

11   Q.    And is it a coordinated thing, all the vehicles arrive at

12   one time?

13   A.    Yes, sir.

14   Q.    I think you testified about the -- a SWAT Team, the FBI

15   SWAT Team --

16   A.    Yes, sir.

17   Q.    -- being a part of it.  Did that turn out to be

18   necessary?  Was the SWAT Team's special capabilities used?

19   A.    Absolutely, yes, sir.

20   Q.    Did anyone there resist or, you know, take up arms

21   against law enforcement as the search was commencing?

22   A.    Uh, they did not.

23   Q.    So the SWAT Team was used, it was deployed, the officers

24   were deployed, but the circumstances that lead to a SWAT Team

25   sometimes being necessary, a hostage situation or something

1   like that, did anything like that develop?

2   A.   Yeah, absolutely.  There's certain reasons why you

3   utilize a SWAT Team.  Part of the information was Witness

4   Number 1 was --

5   Q.   Okay.  I'm not asking about Witness Number 1.  I'm asking

6   about what the people there actually did.

7   A.   When you make the decision as to how to execute a search

8   warrant -- whether it's going to be agent personnel, officers,

9   SWAT teams, what have you -- you take the totality of the

10   circumstances, the information that you know, and you try to

11   do that in the safest possible method.  It was my

12   determination as well as others that the SWAT Team was the

13   appropriate method for that.

14   Q.   And I'm not asking about your determination that was

15   appropriate.  I'm asking about what actually happened.

16   A.   Yes, sir.

17   Q.   So nobody there armed themselves, none of the people who

18   were -- well, let me back up.  When law enforcement descended

19   on this location, there were a number of people present there

20   at the scene who were not law enforcement, right?

21   A.   Correct.

22   Q.   Mr. Rogers' mother, was she there?

23   A.   Yes.

24   Q.   His father?

25   A.   Yes.

1    Q.    Any other people?

2    A.    The brother, Shawn, and then Dylan was also there.

3    Q.    Okay.  So, four people all total?

4    A.    Yes, sir.

5    Q.    Did any of them take up weapons against the police or law

6    enforcement when they came?

7    A.    No, sir.

8    Q.    And did any of them try to take a hostage when the police

9    arrived?

10   A.    No, sir.

11   Q.    Did any of them resist the process in any way?

12   A.    No, sir.

13   Q.    One of the things that became clear on the day of the

14   search and in the days after was that there were media

15   pictures of the search being executed.  Do you recall that?

16   A.    I do.

17   Q.    The media was alerted to the search warrant, to the fact

18   that there would be something happening there?

19   A.    They were not alerted by us.  How they were alerted, I

20   have no idea.

21   Q.    Somebody must have told them though, right?  They didn't

22   just happen to be there.

23   A.    I can -- all I can tell you is that we certainly did not

24   alert the media.  Beyond that, I could only speculate.

25   Q.    Did you tell anybody else -- I mean, was it -- let me ask

1  you this:  Did anyone other than law enforcement, to your

2  knowledge, know that this was going to happen, that the search

3  was going to be executed around noon on May 3rd?

4  A.   No.  It happened very quickly, and it was a fairly small

5  circle of folks that were aware.

6  Q.   And that's because, I mean, you wouldn't want that to be

7  known widely, right?

8  A.   That's correct.

9  Q.   So other than the 50 -- approximately 50 agents -- one,

10 two, three -- four agencies, and various subparts of those

11 agencies, nobody knew to your knowledge that this warrant was

12 going to be -- that a warrant was going to be executed at that

13 location on that day?

14 A.   That is correct.

15 Q.   So if anybody told the media, as far as you know, it

16 would have been someone from law enforcement?

17 A.   Or somebody in the community as we rolled up.

18 Q.   Have you conducted an investigation into how that came

19 about?

20 A.   Into how the media --

21 Q.   Yeah.  How did they know that this was going on in order

22 to be there when it happened?

23 A.   No, sir.

24 Q.   Do I understand right that it's not part of FBI practice

25 to notify the media when you're about to execute a search

1  warrant?

2  A.   Yeah, I'm prohibited as an agent from speaking to the

3  media.  I don't have those conversations at all, ever.

4  Q.   Okay.  Let me -- a couple more questions about the search

5  now.  I think you testified about where this happened.  Was it

6  1204 -- help me out, what was the address?

7  A.   Benson Road, Lot Number 8.

8  Q.   And based on the investigation, were you able to

9  determine who lived at that location?

10  A.   Yes, sir.

11  Q.   Who lived there?

12  A.   Uh, Mr. Rogers' parents and his brother.

13  Q.   Okay.  Mr. Rogers, no.  Correct?  Mr. Rogers did not live

14  there.

15  A.   No, sir.

16  Q.   Based on your investigation, you knew that he lived

17  somewhere else?

18  A.   Yes, sir.

19  Q.   And you knew that when you conducted the search, yeah?

20  A.   Yes, sir.

21  Q.   And was the place where Mr. Rogers actually lived

22  searched?

23  A.   There was no search warrant conducted there.

24  Q.   And that was because you didn't believe there to be a

25  basis that you would find evidence related to this

1    investigation at this man's home?

2    A.    No, we had probable cause for what we searched.

3    Q.    And not probable cause, in your opinion, for his own

4    residence?

5    A.    Correct.

6    Q.    You testified, I think, that three people lived at the

7    place that you searched:  His father, his mother, and a

8    brother?

9    A.    Well, um, no, actually I mentioned Dylan, as well.

10   Q.    Okay.

11   A.    So there was a fourth individual there.

12   Q.    Who was present at the time, who also lived there?

13   A.    Stayed there.

14   Q.    Okay.  Okay.  We've been talking about the search.  I

15   want to now talk about the arrest of Mr. Rogers.  It appears

16   from the discovery that I've received that he was arrested

17   under the authority of an arrest warrant.  Did you have a

18   warrant for his arrest?

19   A.    No, sir, there was no arrest warrant.

20              THE COURT:  I'm sorry, I didn't hear.

21              THE WITNESS:  I'm sorry.  No, there was no arrest

22   warrant.

23              THE COURT:  Okay.

24              MR. MOHRING:  Can I have a moment, Your Honor?

25              THE COURT:  You may.  And what I may have you do,

1   agent, is either move up a little bit closer to the microphone

2   or kind of pull it.  It's not perfect, it doesn't move

3   everywhere, but --

4                THE WITNESS:  Yes, ma'am.

5                THE COURT:  All right.  Thank you.

6                MR. MOHRING:  May I approach, Your Honor?

7                THE COURT:  You may.

8   BY MR. MOHRING:

9   Q.   I'm showing you a document that's actually on the iPad,

10  you see the Bates number down on the bottom there, what we

11  call a Bates number, it's Page 11.  So let me ask again, was

12  there a warrant for Mr. Rogers' arrest?

13  A.   To my knowledge, on the day that we conducted this

14  warrant -- or the search warrant, there was no warrant for his

15  arrest.

16  Q.   Did you see the date on that arrest warrant?

17  A.   I can see this.  I'm not familiar with this document.  I

18  do see that -- I see the date.

19  Q.   And that is or does appear to be a warrant for

20  Mr. Rogers' arrest?

21  A.   It appears.  I'm not familiar with the document --

22  Q.   And it is dated -- the document itself is dated May 3rd?

23  A.   Correct.

24  Q.   The day that the warrant was executed?

25  A.   Correct, unless this is from the Complaint later.

1    Q.   In which case this would have been obtained after he was

2    actually arrested?

3    A.   Correct.

4    Q.   Mr. Rogers was arrested at his home, did I understand

5    that right?

6    A.   Yes, sir.

7    Q.   What was explained to him about the reason that he was

8    being taken into custody?

9    A.   You know, I can't speak to that in great detail, other

10   than that, you know, there was a search warrant being

11   conducted at his parents' residence, he needed to come to the

12   police department to have the conversation with me.

13   Q.   And he was then handcuffed?

14   A.   Yes, sir.

15   Q.   And taken to the Montevideo Police Department?

16   A.   Yes, sir.

17   Q.   And you said roughly 10 minutes after he was first taken

18   into custody, you were in the room with him?

19   A.   That's approximate, but yes, sir.

20   Q.   Okay.  Well, let's talk about the questioning session.

21   You've seen the video?

22   A.   Yes, sir.

23   Q.   As well as looked at the transcript?

24   A.   Yes, sir.

25   Q.   In the video, in the lower -- I'm pretty sure it's the

1    lower-left hand corner, there are actually two times -- well,

2    one timer at least that shows what appears to be the time of

3    day?

4    A.    Yes, sir.

5    Q.    And that timer indicates that this began at 1315, at 1:15

6    in the afternoon.  Does it not?

7    A.    You know, I'm going to take your word for it, sir.  I

8    don't specifically recall that, but I don't not recall it

9    either.

10   Q.    Does that sound about right?

11   A.    Yes, sir.

12   Q.    So not set by the atomic clock, but sometime around 1 in

13   the afternoon is when the interrogation began?

14   A.    Yes, sir.

15   Q.    And the clock, when it finally ends, shows a time of

16   752 -- 1752, that would be 5:52 in the afternoon.  Does that

17   sound about right?

18   A.    Yes, sir.

19   Q.    So, the timeframe of this interrogation was from 1:15 to

20   5:52, give or take.  Right?

21   A.    Yes, sir.

22   Q.    It appeared to me watching the tape that it was about a

23   7-minute period, 1315 to 1322, between when you first --

24   someone first interacts with Mr. Rogers in that room and the

25   beginning of the interrogation of your questioning.  Does that

1    sound about right?

2    A.   That's about right, yes, sir.

3    Q.   And that questioning then continued from at least what

4    the timestamp shows at 1322 for about 40 minutes before you

5    administered the *Miranda* warning?

6    A.   That is correct.

7    Q.   And once the questioning started, again the timestamp

8    looks like 1322, from there to the point of you advising him

9    of his constitutional rights, there were no breaks in that

10   section of the questioning.   Correct?

11   A.   I do not recall any breaks in that session.

12   Q.   And you went from advising him of his *Miranda* rights to

13   continue the questioning right after.   There was no break

14   after that either, right?

15   A.   Sometime after that there was, but not right then.

16   Q.   Okay.   Based on my review, the questioning continued

17   until 1436, that would be 2:36 -- does that sound about

18   right -- before there was a break?

19   A.   Yes, sir.

20   Q.   So he was questioned from 1:22 to 2:36, again

21   approximately, without any interruption.   Yes?

22   A.   Yes, sir.

23   Q.   The clock shows that the questioning resumed at 1537, so

24   there was a pause of about an hour.   Would you dispute that?

25   A.   I would not.

1   Q.   And during that hour timeframe, Mr. Rogers was alone in

2   the room?

3   A.   Yeah, there was an officer outside the door, but he was

4   alone.

5   Q.   So that's one of the breaks.  It also appeared to me that

6   there was a break between 1715 -- that would be 5:15 in the

7   afternoon -- and 5:51, 1751.  Does that sound about right?

8   A.   Yes, sir.

9   Q.   And at 1715, that's -- I believe that ended your

10  interaction with Mr. Rogers.  The next discussion was -- did

11  you say a DNR agent?

12  A.   Officer, yes, sir.

13  Q.   Officer, who transported him?

14  A.   Actually, he didn't do the transport.  He was basically

15  just sitting outside making sure that, you know, to watch the

16  room.

17  Q.   All right.  You watched the tape, Mr. Rogers remained

18  handcuffed throughout this time period?

19  A.   Yes, sir.

20  Q.   From 1:15 to 5:52 and beyond?

21  A.   Yeah, there was a point at which -- I don't remember the

22  exact point but I did un-handcuff him at some point, but it

23  was much later in the interview.

24  Q.   And was that to -- at least in the beginning, he's

25  handcuffed behind his back, right?

1    A.    Yes, sir.

2    Q.    And sitting in a chair with his hands behind his back?

3    A.    Yes, sir.

4    Q.    And that -- he remained in that physical position for at

5    least some part of the interview.  Do you know how long?

6    A.    No, I do not.

7    Q.    Later on in the interview, you can see him with his hands

8    in front of him but still handcuffed.  Right?

9    A.    I think actually when his hands are in front of him, he's

10   not handcuffed.  When he's doing the computer part, I don't

11   recall him being in handcuffs, but he possibly was.

12   Q.    At some point was he allowed to at least take his hands

13   from behind his back --

14   A.    Yes, sir.

15   Q.    -- and bring them in front of him?  In beginning the

16   questioning -- so let me focus on the pre-*Miranda* part of your

17   questioning of him, did you tell him that he was free to go?

18   A.    I did not.

19   Q.    His freedom of movement was restrained, he wouldn't have

20   been allowed to leave the room.  Right?

21   A.    Correct.

22   Q.    In fact, he's sitting on a chair that's up against the

23   wall, a wall of the room?

24   A.    Yes, sir.

25   Q.    You're sitting in front of him, the Chief of Police, as

1    well?

2    A.   Chief was sort of off to the side, but yes, sir.

3    Q.   And the door would be on the other side of you, right?

4    A.   Yes, sir.

5    Q.   Obvious, but let me ask the question:  He did not

6    initiate contact with authorities in any way, did he?  He was

7    there because you brought him?

8    A.   He drove up to his house and was contacted by officers in

9    front of his house -- or at his house.

10   Q.   Okay.  And the interrogation consisted of, I think,

11   almost entirely or almost entirely you asking him questions

12   and him answering your questions?

13   A.   Primarily, yes, sir.

14   Q.   And he was placed under arrest.  Had he actually been

15   formally told "You are under arrest" before being brought

16   there?

17   A.   Not that I'm aware of.

18   Q.   But after he was?

19   A.   Some time later.

20   Q.   Based on the investigation?

21   A.   Yes, sir.

22   Q.   And you testified on direct examination that you held off

23   on advising him of his constitutional rights under the *Miranda*

24   decision?

25   A.   Yes, sir.

1   Q.   You understand that an individual is entitled to be

2   informed of certain things when custodial interrogation is

3   going on.  Right?

4   A.   Yes, sir.

5   Q.   And you know that from your training as an FBI Special

6   Agent, among other things?

7   A.   Yes, sir.

8   Q.   People are entitled to be told that they have a right to

9   a lawyer.  Right?

10   A.   Uh-huh.

11   Q.   And he was not, during that first phase?

12   A.   That is correct.

13   Q.   People are entitled to be told that they have a right to

14   meet with a lawyer and to have that lawyer present during any

15   questioning.  Right?

16   A.   Yes, sir.

17   Q.   And he was not told that either?

18   A.   Not initially.

19   Q.   He -- people have a right to be told the consequences

20   that might flow from speaking, that anything that they said

21   could or would be used against them.  Right?

22   A.   Yes, sir.

23   Q.   And that's a right that applies in any situation of

24   custodial interrogation.  That's your understanding, right?

25   A.   Not any.  I mean, in this case we're talking about a

1    public safety exception --

2    Q.    Okay.  We'll get to that.  But at least under ordinary

3    circumstances, a person who is -- well, let me ask:  You agree

4    that what was going on was custodial, yeah?

5    A.    Yes, sir.

6    Q.    You agree that it was interrogation?

7    A.    Yes, sir.

8    Q.    And the decision to not advise him of his rights was made

9    because of a concern that if you did, he might not talk to

10   you, he might, in fact, exercise those rights that the

11   Constitution gives him?

12   A.    We have to --

13   Q.    Otherwise, why not?

14   A.    We have to try to develop information related to this

15   plot.  This is a right now, not a hypothetical plot.  It's a

16   real plot.  And it's been proven by the fact that there are

17   actually explosive devices, incendiary devices at the scene,

18   so we made the decision to proceed without *Miranda*.

19   Q.    Because you were concerned if you gave him *Miranda*, he

20   might not talk to you --

21   A.    I suppose that is certainly a possibility.

22   Q.    You said, again, I think you had solid information.  The

23   solid information was Witness Number 1.  Right?

24   A.    Well, corroborated with what we actually found at the

25   site.

1    Q.    Which were weapons and explosives devices --

2    A.    And incendiary devices.

3    Q.    That were stored there?

4    A.    That were there.

5    Q.    Was the condition of the incendiary devices that were

6    found such that it looked like they were about to be used?

7    Were they set up in a manner that would suggest that the plan

8    was to detonate them as they were?

9    A.    They were sitting on a shelf.

10   Q.    Okay.

11   A.    I don't know that I can extrapolate much past that.

12   Q.    Fair enough.  Okay.  Still -- now a couple more questions

13   about this pre-*Miranda* phase of the interrogation.  I think

14   the tape begins again at 3:15, someone says, "Just hang

15   tight."  Do you remember that?

16   A.    Yes, sir.  Yes, sir.  Excuse me.

17   Q.    And Mr. Rogers is in the chair where he remained for --

18   except for the bathroom break -- the entirety of this time

19   period, from 1 to almost 6:00?

20   A.    Yes, sir.

21   Q.    The bathroom break happened pretty late in the process,

22   right?

23   A.    It did, towards the end.

24   Q.    If I said that the clock on the tape said 1712 when that

25   interaction happened, does that sound about right?

1   A.   Yes, sir.  I don't disagree.

2   Q.   And was that the only time that he was actually allowed

3   to leave the room?

4   A.   It wasn't so much a question of being allowed to leave

5   the room.  He never asked either, so that's the only time.

6   Q.   Was he offered before that?

7   A.   Um, I don't know that I -- I do not recall.  I think not,

8   but I don't recall.

9   Q.   Okay.  Let me ask you some questions about the focus and

10  the questioning that happened, again before *Miranda*.  You

11  discussed with him the contents of a trailer, a storage unit

12  that was part of what was being searched at the time?

13  A.   Yes, sir.

14  Q.   You talked about black powder being there.  Correct?

15  A.   Yes, sir.

16  Q.   Asked him about a fuse or fuses?

17  A.   Yes, sir.

18  Q.   You asked him about whether his prints would be on any of

19  the items seized during the search?

20  A.   Yes, sir.

21  Q.   You asked about the Molotov cocktails and who made them?

22  A.   I did.

23  Q.   There was a discussion of photographs and the possibility

24  of looking at them together, photographs of the search.  Do

25  you recall that?

```
1    A.    I do.  Would you like me to enlighten you on that or --

2    Q.    I'm just asking, that was one of the topics that came up

3    during this time period before *Miranda* was given.  Right?

4    A.    Yes, sir.

5    Q.    And it came up because you asked him about it.  Right?

6    A.    Yeah, we were discussing the explosive devices.  He asked

7    if he could see photos of them to help him refresh his

8    recollection of the devices.

9    Q.    Okay.  And you said that would be okay?

10   A.    Uh-huh.  Yes, sir.

11   Q.    Actually, let me get you a copy of the transcript because

12   I have some questions about that.  I've given of you what's

13   been admitted as Government Exhibit --

14   A.    Do you want this one back --

15              THE COURT:  Can I stop for a minute and have the

16   attorneys approach?  I want to ask about logistics for a

17   second.

18              **(Off-the-record discussion held at bench.)**

19              THE COURT:  All right.  Thank you.  I think it makes

20   sense to take a break.  We're not going to break for lunch;

21   we're just going to take a 15-minute break to stretch.  I

22   think there's enough left that we should take our break now,

23   so we'll be in recess for about 15 minutes, and then we'll

24   return.

25              **(Short break taken.)**
```

```
 1              THE COURT:  All right.  We'll continue with
 2    cross-examination.
 3              Mr. Mohring.
 4              MR. MOHRING:  Thank you, Your Honor.
 5    BY MR. MOHRING:
 6    Q.   I guess -- afternoon.  Okay.  Before we took a break, I
 7    was asking you some question about the condition of some of
 8    the items that were found during the search, and you said
 9    that, what, I think you called "incendiary devices" were on a
10    shelf?
11    A.   Yes, sir.
12    Q.   You talked about Molotov cocktails having been found
13    during the search?
14    A.   Molotov cocktails are the incendiary devices, just so --
15    Q.   Oh, those are?
16    A.   Yes, sir.
17    Q.   We're talking about the same thing --
18    A.   Yes, sir.
19    Q.   And they were on a shelf?
20    A.   Yes, sir.
21    Q.   And based on the investigation, you know that when those
22    Molotov cocktails were found, the contents were separated?
23    Back up a step.  Inside a Molotov cocktail, typically at least
24    two different types of things are put --
25    A.   Correct.
```

1    Q.   And in order for it to function, those things get mixed

2    together?

3    A.   Correct.

4    Q.   In this instance, they were -- the contents of the

5    bottles were separate.

6    A.   They're almost always going to be separate in a --

7    because the weights of the different -- you know, they're

8    going to separate because one thing is heavier, one thing is

9    lighter.

10   Q.   Right, and that's the condition that they were found in,

11   the contents had separated?

12   A.   Yes, sir.

13   Q.   Was there any kind of wick or --

14   A.   My understanding is, yes, sir, there was.

15   Q.   Okay.  We were talking about some of the questions that

16   you asked before *Miranda*, so still focusing on the pre-*Miranda*

17   discussion.  I was asking you about the interaction, about

18   looking at photographs together.

19   A.   Yes, sir.

20   Q.   And -- do you have a copy of the transcript in front of

21   you?

22   A.   I do.

23   Q.   Let me direct your attention to six pages in.  You with

24   me?

25   A.   Um, the bottom right, what number?

1    Q.   You know what, the one I'm looking at doesn't have page

2    numbers, but it would be six pages after the beginning.  This

3    was -- the page that begins at the top, "Yeah, there is" --

4    A.   Yes, sir.  I'm on the same page.

5    Q.   Okay.  So, six pages in, you say, "He's going to send me

6    pics, and then we'll" -- and then Mr. Rogers responds or says

7    something.

8    A.   How far down?

9    Q.   Two-thirds of the way down, three quarters.  Shane Ball:

10   "He's going to send me pics, and then we'll" --

11   A.   Yep.  Yeah, then he asked me -- okay.

12   Q.   Do you recall the discussion of pictures coming up before

13   that?  In any event, there was a conversation about pictures.

14   A.   Yes, sir.  He asked me if we could send him -- okay,

15   yeah, if you go back one page, he asks, towards the top of

16   that page:  Can you send me a picture so I know what we're

17   talking about or anything, et cetera.  And there's actually a

18   conversation -- it's an overhear of my cell phone conversation

19   with the people at the site asking them to send me the

20   pictures.

21   Q.   Did that ever happen?

22   A.   Yes, sir.

23   Q.   And did you review pictures with Mr. Rogers?

24   A.   I did.

25   Q.   Before or after you advised him of his rights?

1   A.   Before.

2   Q.   There was a discussion about other property and who lived

3   there.  Do you recall that?

4   A.   Yeah.  Are we speaking of the property up north --

5   Q.   Right --

6   A.   Or -- not Granite Falls but -- yes, sir.  Yes --

7   Q.   And those were questions that you asked him and that he

8   responded to before he was advised of his *Miranda* rights.

9   Right?

10  A.   That's correct.

11  Q.   You asked questions to decide and determine which guns he

12  handled, which were his, and which belonged to other people

13  who lived there.

14  A.   Yep, primarily which weapons did he handle.

15  Q.   Okay.  You asked him questions about which of the weapons

16  that you found would have his prints on them?

17  A.   Yes, sir.

18  Q.   Before advising him of his *Miranda* rights?

19  A.   Yes, sir.

20  Q.   You asked him which ones would have -- you talk about

21  DNA, which might have DNA on them?

22  A.   Yes, sir.

23  Q.   Right?  Before advising of his *Miranda* rights?

24  A.   Yes, sir.

25  Q.   You talked about shooting guns at a range and who did and

1    who didn't.  Do you recall a discussion along those lines?

2    A.    I do.

3    Q.    Before *Miranda*?

4    A.    Yes, sir.

5    Q.    And there was a discussion about some of the specifics of

6    the weapons that were found at the house.  Right?  A

7    conversation about what type of grip or stock was on one of

8    the weapons --

9    A.    Uh-huh, yes, sir.

10   Q.    Now, the charges that he faces are possession of weapons

11   and destructive devices.  You understand that?

12   A.    I understand that.

13   Q.    You've seen the Indictment?

14   A.    I have.

15   Q.    And you were asking him details about some of the

16   configurations of the details of the weapons that were found?

17   A.    That's correct.

18   Q.    Before advising him of his *Miranda* rights?

19   A.    Correct.

20   Q.    Okay.  *Miranda* comes up, by my count, about 30 pages in,

21   at 1404.  It looks like at the top of Page 133.  And for the

22   record, this is a document that begins at Page 102.  And so

23   you already testified, I think, that questioning had been

24   going on for about 40 minutes at this point.

25   A.    That's correct.

1    Q.   And you begin saying, "Because I don't know where I'm --

2    what I'm going to do when we leave here, I have to advise you

3    of your rights."  Right?

4    A.   Correct.

5    Q.   And the discussion then continues without any break,

6    before or after *Miranda*.  Right?

7    A.   Correct.

8    Q.   You asked him again questions about what belongs to who?

9    A.   Yes, sir.

10   Q.   Of those things that were found during the search?

11   A.   Yes, sir.

12   Q.   Before and after.  You asked him questions about his

13   handling of weapons, firearms that were found during the

14   search, after *Miranda* as well as before?

15   A.   Yes, sir.

16   Q.   And you reviewed, after giving him the *Miranda* warning,

17   some of the things that he had told you before.  Right?

18   A.   Yes, sir.

19           MR. MOHRING:  Can I have a moment, Your Honor?

20           THE COURT:  You may.

21           MR. MOHRING:  Your Honor, I have no further

22   questions at this point.

23           THE COURT:  All right.

24           Mr. Winter, redirect?

25           MR. WINTER:  Yes, Your Honor, thank you.

```
 1            R E D I R E C T   E X A M I N A T I O N
 2    BY MR. WINTER:
 3    Q.   Going back to the Affidavit, Agent Ball, were there
 4    specifics included by Witness 1 about statements made by
 5    Mr. Rogers about recent events that played into your mindset
 6    and the mindset of law enforcement?
 7    A.   Yes, sir, there was.
 8    Q.   And what was that?
 9    A.   Specifically we were, you know, approximately three weeks
10    away from the Boston bombing.  And Witness 1 described the
11    fact that when the Boston bombing occurred that the Rogers
12    cheered that event.
13    Q.   The -- were you aware at the time that this happened
14    that -- whether or not Mr. Rogers was a member of some kind of
15    militia group?
16    A.   Yes, sir, the Black Snake Militia.
17    Q.   Okay.  Was there anything -- first of all, did you learn
18    about that from Witness 1, as well?  Did Witness 1 speak to
19    that?
20    A.   He did.
21    Q.   In what context?
22    A.   Just through his militia, he had originally, according to
23    the statement, thought it was more of a protest group.  It
24    turned out to be more of a militia hate -- according to him --
25    group.  They engage in various training activities, et cetera.
```

1    Q.   Okay.  Was there anything at the search site, before even

2    entering the Montevideo search site, was there anything that

3    suggested that the Rogers family were, indeed, members of this

4    militia group?

5    A.   Yeah.  They have a large sign kind of out front of the

6    trailer that says "BSM," or did at that time.

7    Q.   Okay.  And do they fly a flag a certain way?

8    A.   Yeah, there's a -- depending upon different times, but

9    the flag flies upside down.  The U.S. flag flies upside down.

10   Q.   Okay.  What was your understanding, based on the

11   interview that was reported to you regarding Witness 1, as to

12   why Witness 1 left Minnesota for San Antonio just prior to

13   reporting to the San Antonio PD?

14   A.   As they were having conversation related to -- about the

15   pending plot to do violence in the city of Montevideo,

16   Witness 1 said he didn't want to be a part of that.  And then

17   his girlfriend at the time overheard a conversation which led

18   them to believe that he was in physical danger because he

19   didn't want to participate and had information related to that

20   plot.

21   Q.   Was there information from Witness 1 regarding not only

22   Mr. Buford Rogers possibly doing harm but his father, Buford

23   Rogers' father, doing harm to members of law enforcement?

24   A.   Yes, sir.

25   Q.   And what was that information?

1    A.   It was information that on a previous occasion when

2    Mr. Rogers, Senior believed that the police department were at

3    the door, he fired out the window -- or I'm sorry, out the

4    door where he thought law enforcement was.

5    Q.   That he would fire at law enforcement?

6    A.   That he did fire --

7    Q.   That he did shoot at law enforcement?

8    A.   He thought that law enforcement was at the door, fired a

9    round through the door.

10   Q.   Thank you.  Was that also in the back of your mind and

11   law enforcement's mind when you were preparing to execute the

12   search warrant in Montevideo?

13   A.   That absolutely was a factor, particularly as it relates

14   to the decision that we make to which assets are we going to

15   utilize for the execution of the search warrant.

16   Q.   For instance, the SWAT Team?

17   A.   Yes, sir.

18   Q.   Okay.  And perhaps a little more on the SWAT Team and

19   what specifically they did in this occasion, did they walk up

20   and knock on the door, or did they do some other technique in

21   order to begin the execution of the search warrant?

22   A.   Um, yeah, they drove up, armored personnel, vehicles, and

23   then called out the folks out of the trailer and --

24   Q.   Is that a -- in law enforcement terms, do they call that

25   a "call-out"?

1    A.    Yes, sir.

2    Q.    And just generically, what is a call-out?

3    A.    That's where you take cover and concealment in the best

4    possible means.  In this case it was a vehicle.  Get on the

5    loud speaker, announce our presence; what we're there for, to

6    effect a search warrant; and then call the people out of the

7    building to the officers -- or agents in this case.

8    Q.    Okay.  Mr. Mohring asked a number of questions about you

9    not giving *Miranda* prior to engaging in conversations and your

10   understanding of what the law requires.  I do want to revisit

11   the issue of, are you aware of whether or not on prior

12   occasions Mr. Buford Rogers has had his *Miranda* rights read to

13   him and acknowledged understanding them and has agreed to talk

14   to law enforcement?

15         MR. MOHRING:  I object to the relevance of this,

16   Your Honor.  Renew the objection.

17         THE COURT:  Um, as to prior *Miranda*, I will allow

18   a -- well, there has already been testimony related to at

19   least a couple references to time before.  What I had trouble

20   with was before the Government getting into all the details of

21   the prior -- that seems to me to be going beyond what's

22   relevant.  So, you will be allowed to ask the question you

23   just asked, and then we'll see where you go from there.

24         MR. WINTER:  Okay.

25

1    BY MR. WINTER:

2    Q.   And are you aware of two such occasions?

3    A.   Yes, sir, we were.

4    Q.   And if you would just summarize briefly the date and what

5    you know about those two rights advisories, not the underlying

6    cases --

7         MR. MOHRING:  Your Honor, again, I would renew the

8    relevance objection.

9         THE COURT:  It will be overruled at this time.

10        THE WITNESS:  In both 2007 and 2010, Mr. Rogers was

11   advised of his rights by officers of the Montevideo Police

12   Department.

13   BY MR. WINTER:

14   Q.   And on those occasions, did he waive his rights and give

15   a statement?

16        MR. MOHRING:  Objection.  Relevance, Your Honor.

17        THE COURT:  All right.  Overruled.

18        THE WITNESS:  He did.  Yes, sir.

19   BY MR. WINTER:

20   Q.   Okay.  All right.  And those were recorded, correct?

21   A.   Yes, sir.

22   Q.   All right.  Onto the devices that you did find, there was

23   a question about the Molotov cocktail and some possible

24   separation of the contents.  At the time that the search is

25   taking place, separated contents or not, does that bear at all

1   on whether or not you or fellow agents believed there was a

2   potential threat that those devices were present and fused?

3   A.   No.   They -- they're going to be separated right up until

4   the time they're used or thrown and they break and it all kind

5   of goes together.   So, just because of the weight and --

6   again, I'm not trying to pretend to be a chemist, the weight,

7   they're going to be separated all the time.

8   Q.   Okay.   The pipe bomb, did it have a fuse on it?

9   A.   It did.   Yes, sir.

10  Q.   The black powder and nail devices that were in the

11  canisters, were those fused, as well?

12  A.   Yes, sir.

13  Q.   Okay.   Can you explain in a little more detail why you

14  were showing photographs to Mr. Rogers of the items that were

15  at present at the time this was happening, being located at

16  the search site?

17  A.   Yeah, as we're discussing these devices, what I'm trying

18  to establish is how they're made, how they're manufactured,

19  what the firing component is.   I've got bomb techs that are

20  searching this right now, I've got evidence response folks

21  that are searching this right now.   So if I can show him the

22  picture and he requests to see the picture, so if I show him

23  the picture he can more accurately describe what they are.

24  Q.   Why did you ask him about, for instance, fingerprints

25  being on an item?

1    A.   Several things.  I have to establish what -- how things
2    were made and let's talk about that -- sorry about that --
3    about the explosive devices specifically.  I have to figure
4    out who made them so that I can figure out how they're made so
5    I can figure out how we are to handle them so that we can
6    figure out -- so that no one additionally gets injured in the
7    community.  In order to establish who made them, I use the
8    fingerprints as kind of a goalpost to, you know, try to figure
9    out who actually made the devices.  His prints, you use that
10   as a tool.  Once you establish who made them, then I have
11   better information and can communicate that back to the bomb
12   techs or the appropriate people.
13   Q.   And why did you ask him, for example, about the property
14   up north?
15   A.   We don't know -- I mean there's -- we have this
16   information that there's an active plot to do violence.  We
17   have weapons and explosives that would be consistent with a
18   plot.  I'm trying to establish is there other locations where
19   there could be weapons, is there other locations where there
20   could be explosives.
21   Q.   Why did you ask him about what weapons from the house he
22   may have handled?
23   A.   A couple of reasons.  The one is I'm trying to figure
24   out, sort of ascertain his capabilities, ascertain what he has
25   access to in order to commit this plot, ascertain his

1    capabilities as far as like just competence with firearms.

2    Q.   Why did you ask him about shooting guns at the range and

3    who shot and who didn't shoot?

4    A.   That goes to that same kind of competency issue.  I have

5    to try to determine in a fairly short period of time if he has

6    the capabilities to do an act or if there's other people out

7    there that we need to be looking for, if there's other sort of

8    trainer-type folks that are teaching these things.

9    Q.   Okay.  And what was the object of your post-*Miranda*

10   questioning as opposed to your pre-*Miranda* questioning?

11   A.   Well, post-*Miranda* questioning is very much would be more

12   standard as to, you know, a standard interview that we would

13   do to gather evidence.

14   Q.   Okay.

15          MR. WINTER:  One moment, Your Honor.

16          THE COURT:  Okay.

17   BY MR. WINTER:

18   Q.   Did your object of your questioning intentionally shift,

19   then, post-*Miranda*?

20   A.   Yes, sir.

21   Q.   Okay.

22          MR. WINTER:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Mohring, re-cross?

24

25

```
1              R E C R O S S   E X A M I N A T I O N

2    BY MR. MOHRING:

3    Q.   And with this shifted objective, you asked the same

4    questions about fingerprints, what would his fingerprints be

5    on, as you would ask before *Miranda*.  Right?

6    A.   Several of the same questions were asked, and then a

7    whole set of new questions.

8    Q.   Okay.  With this changed objective, you asked what were

9    the weapons he handled, before and after.  Right?

10   A.   Yes, sir.

11   Q.   With the changed objective, you asked questions about

12   what he might have done at a shooting range, before and after?

13   A.   Yes, sir.

14   Q.   Fingerprints being relevant to a charge of possession

15   such as he is facing, right?

16   A.   As well as relevant to -- yes, sir.

17   Q.   What he had handled and his admission of what he had

18   handled being relevant to a charge of possession.  Yes?

19   A.   Yes, sir.

20   Q.   Before and after *Miranda*.  Right?

21   A.   Yes, sir.

22   Q.   Now, just now you were asked questions that -- focusing

23   on the pre-*Miranda* phase, that you asked some questions about

24   who made the devices and how they were made.  Right?

25   A.   Yes, sir.
```

1   Q.   I understand questions of how the devices were made, what

2   the components are might will relate to how actively dangerous

3   they were at the time, right?  Was that part of the concern?

4   A.   Rephrase that for me.  I'm not certain I follow your --

5   Q.   So that we're clear, I'm focused on the pre-*Miranda*

6   phase --

7   A.   Yes, sir.

8   Q.   -- and I'm asking you about your statement that you asked

9   him questions about who made devices and how they were made.

10  Right?

11  A.   Yes, sir.

12  Q.   How they were made, I mean that would give some

13  information about how inherently dangerous they were in their

14  condition.  Right?

15  A.   Yes, sir.

16  Q.   Depending on how it was made, it might be more or less

17  volatile or likely to explode.  Right?

18  A.   Correct.

19  Q.   Who made them has nothing to do with how dangerous they

20  are in their present state.

21  A.   Oh, absolutely.  If the person who made them is telling

22  me how they're made, that's a much more accurate statement

23  than if they're just there and he thinks they're made this

24  way.  The "who" is a very crucial part of that.

25  Q.   At the time that you were asking these questions about

1   who made them and how they were made, pre-*Miranda*, whatever

2   was there at the site was secure.  Correct?

3   A.   The items at the site, yes, sir.

4   Q.   Yeah, the people who were there at the time that all the

5   law enforcement arrived, they were not allowed access to the

6   place that was being searched, right?

7   A.   Yeah, but I still had, you know, our people in there

8   dealing with these items.

9   Q.   I'm just saying, nobody else other than law

10  enforcement --

11  A.   Yes, sir.

12  Q.   -- had access to anything that was there at the scene,

13  correct?

14  A.   Correct.

15  Q.   Particularly Mr. Rogers who was handcuffed, hands behind

16  his back, in an interrogation room at the police department.

17  Right?

18  A.   That's correct.

19  Q.   You had testified about black powder devices, and I think

20  you mentioned or used a phrase that those had been rendered

21  safe?

22  A.   Yes, sir.

23  Q.   What does that mean?

24  A.   Just so everyone in the courtroom is clear, I am -- I

25  have specialties in the FBI but bomb technician is not one of

1   them, so I'm going to do this very much in layman's terms.

2   What bomb technicians do frequently, they'll x-ray it, figure

3   out if they can handle it safely.  Either that's with the

4   robot or the bomb suit or any number of items.  They then take

5   that item to a safe location, they dig a hole, they put a

6   barrier inside that hole, and then they put -- again very

7   layman's terms -- a sheet of explosives over the top of it and

8   then they blow it up.

9   Q.   So they render it safe by blowing it up?

10  A.   In a safe manner, yes, sir.

11  Q.   Okay.

12  A.   There's no real other way to do that.

13  Q.   Did I hear you right that there's some questions about

14  the SWAT Team and a call out, did the SWAT Team arrive in an

15  armored vehicle, did you say that?

16  A.   Yes, sir.

17  Q.   How many?

18  A.   Two.

19  Q.   And there was -- you just testified about information

20  that you had about Mr. Rogers' father.  Right?

21  A.   Yes, sir.

22  Q.   And that the information that you were testifying about

23  was information that came from this one witness, Witness

24  Number 1?

25  A.   Correct.

1    Q.   And only from that witness?

2    A.   Correct.

3    Q.   There was something about firing out of a window.  Did

4    anybody fire out of a window?

5    A.   Well, the information was about firing out a door, the

6    front door.

7    Q.   Okay.  Did anyone fire out of a front door or anything

8    else?

9    A.   Um, on the day of the search warrant?

10   Q.   Yes.

11   A.   No, sir.

12   Q.   Finally, I think you were just asked some questions about

13   the Black Snake Militia.  Right?

14   A.   Yes, sir.

15   Q.   Based on your involvement in this investigation going

16   back at least until October of 2012, what's your understanding

17   of who is -- who are the members of that group?

18   A.   Primary members, as best as I can, primary members are

19   the family.

20   Q.   Three or four people?

21   A.   That we've been able to identify, yes, sir.

22   Q.   In an investigation that goes back to October of last

23   year.  Right?

24   A.   Yes, sir.

25   Q.   Now, finally, you were asked something about a flag

1    sometimes being flown upside down.  Are you -- an American

2    flag?

3    A.   Yes, sir.

4    Q.   You understand that a flag flown upside down is a --

5    that's a signal of distress?

6    A.   Duress, yes, sir.

7    Q.   Used by -- at least in the Navy by ships.  Yes?

8    A.   I'm aware of that, yes, sir.

9             MR. MOHRING:  Nothing further.

10             THE COURT:  Okay.  Brief?

11             MR. WINTER:  Two questions, Your Honor.

12                     C O N T I N U E D

13             R E D I R E C T   E X A M I N A T I O N

14    BY MR. WINTER:

15    Q.   One I just forgot to ask, could you explain to the Court

16    why you had Mr. Rogers handcuffed during the interview?

17    A.   Yes, sir.  At the time we went into that room, we have

18    this plot, this possible plot to conduct an act of violence.

19    Upon the execution of the search warrant, we have sort of the

20    methods for that plot to go forth.  We have the explosives, we

21    have the weapons.  We bring him into the police station, which

22    is different than a jail.  It's sort of a different

23    environment.  It's not a secure facility in a true way.  I

24    don't know how Mr. Rogers is going to be, I don't know what

25    kind of guy he is.  I make the determination that that's the

```
 1   right thing to do from an officer-safety standpoint and --
 2   Q.   And then onto this how devices are made versus who made
 3   them line of questioning that you've had, the "who made it"
 4   question, does that relate to your concern about who else
 5   might be capable and associated with Mr. Rogers who would
 6   continue to present a threat?
 7   A.   Yeah, absolutely.  We're trying to establish who made the
 8   devices because if Mr. Rogers made them, sobeit.  But if
 9   someone else made them, we need to widen that net, we need to
10   keep looking, as well as how they're made.
11   Q.   All right.
12              MR. WINTER:  Thank you.  No further questions.
13                     C O N T I N U E D
14           R E C R O S S   E X A M I N A T I O N
15   BY MR. MOHRING:
16   Q.   Widen the net to further your investigation, right?
17   A.   There's an active plot.  If there's other people out
18   there who could be potentially doing harm in the next day,
19   which is the day that this event is supposed to occur, we need
20   to be looking there.
21   Q.   But you were asking about things that were found during
22   the search, right?
23   A.   Yes.
24   Q.   And the things that were found during the search were
25   things that nobody would have access to except for law
```

1    enforcement at the time that you were asking those questions.

2    Right?

3    A.    Yeah, but we don't know if there's other devices --

4    Q.    Okay.

5    A.    I'm sorry.

6    Q.    Nobody could touch those things, other than law

7    enforcement, at the times that you were asking questions about

8    them?

9    A.    Those specific devices, yes, sir.

10   Q.    You were just asked questions about why you kept -- or

11   why Mr. Rogers was kept handcuffed during this period of

12   interrogation just now.

13   A.    Yes, sir.

14   Q.    And you said part of the reason was because of a possible

15   plot.  Right?

16   A.    Yes, sir.

17   Q.    As to which you had one witness and one witness only,

18   right?  Only one person had told you -- had made any

19   allegation like that to you, right?

20   A.    Yes, sir, but in the totality of the circumstances, you

21   go to the house and the explosives are there, the weapons are

22   there --

23   Q.    On the shelf, right?

24   A.    Some were on the shelf, some were other places, but yes,

25   sir.

1   Q.   Okay.

2           MR. MOHRING:  Nothing further, Your Honor.

3           THE COURT:  Okay.  All right.  You're excused.

4   Thank you.  Any further witnesses from the Government?

5           MR. WINTER:  No, Your Honor.

6           **(Witness leaves stand.)**

7           THE COURT:  Mr. Mohring -- and, oh, by the way, I

8   wanted the record to reflect that I pointed to Mr. Mohring for

9   that last re-cross, and his first question started with the --

10  "Widen the net" to widen the investigation.  Just so the

11  record is clear that we switched speakers at that moment.

12          Mr. Mohring, any witnesses?

13          MR. MOHRING:  No, Your Honor.

14          THE COURT:  All right.  I would assume that briefing

15  may be in order, but I want to hear you out on any of the

16  other motions that were filed other than what was in writing.

17  So, why don't we take an opportunity at this point to tell me

18  if there's anything else you'd like to put on the record with

19  regard to the other motions that were filed.

20          Mr. Mohring.

21          MR. MOHRING:  Your Honor, we filed a motion seeking

22  Rule 16 discovery.  There are no obvious omissions from the

23  materials that I've received.  We filed a *Brady* motion.

24  Again, no obvious omissions from what I have now received in

25  response to -- and some of that subsequent to the motions

being filed.  Same for the motion to discover statements.  No

obvious omissions, and based on the testimony it appears clear

that what is now on the record is all that there is as far as

statements related to the investigation and the charges.

I filed a motion -- actually two motions on which I

would ask that the Court set deadlines.  One is a motion

seeking expert discovery under Rule 16(a)(1)(G).  I would ask

that the Court set a deadline sometime in the near future for

that disclosure.  There's a motion seeking access to any

electronic surveillance.  I have no reason to dispute the

Government's assertion that there was none.  Same thing for

informant; they say there were none.  I don't have any basis

to contest that either.

The second deadline that I would ask that the Court

set is one for notice of any evidence that the Government

seeks to introduce under Rule 404 of the Federal Rules of

Evidence.  I appreciate that the Government has given some

notice of some things that I think their position is this is

not 404, but I'm grateful for the notice nonetheless.  This is

a part of the response to our motions that they filed.  But I

would ask that the Court set a deadline for the notice of any

other 404 evidence sometime in the very near future.  As the

Court has heard, there's been an investigation that has gone

on for quite some time.  The Government offer of 14 days for

notice is not sufficient to allow the defense enough time to

1     investigate, which we would have to do, and to prepare to
2     litigate the admissibility or non-admissibility of that
3     evidence, which is the reason for giving us notice in the
4     first place, I think.  So, bottom line is I'm asking that you
5     set something closer to now for a deadline for 404.
6              The final motion of a discovery nature that we filed
7     that I would like to talk about is just the motion for early
8     Jencks Act material.  The Government's offer is three days as
9     is custom, they say.  I'm aware of a number of customs.  Some
10    of them go as high as five days.  My only request is to
11    confirm that when they say three days that we're talking about
12    three business days.  And that's all that I have on the
13    discovery motions.
14             THE COURT:  Okay.
15             MR. MOHRING:  That's what you wanted to talk about
16    now, right?
17             THE COURT:  Yes, yes.  Mr. Winter, responses?
18             MR. WINTER:  Your Honor, on the 404(b), I'm not
19    aware of anything else that we have, so I believe we've
20    already complied.  And to the extent we come across anything,
21    we'll certainly immediately disclose it.  So, I guess I don't
22    object to a -- sort of an immediate deadline for 404(b)
23    because we'll just give it up as we get it.
24             Regarding the expert, I would ask the Court for
25    something in the neighborhood of two to three weeks prior to

```
 1    the trial date.  We don't have experts identified at present
 2    and had we, we would start the process.  But I think three
 3    weeks is a reasonable time.
 4              And then Jencks, we can go with the
 5    three-business-day rule --
 6              THE COURT:  Okay.
 7              MR. WINTER:  -- and resolve that.
 8              THE COURT:  All right.  Very good.
 9              MR. WINTER:  Thank you.
10              THE COURT:  Mr. Mohring.
11              MR. MOHRING:  Your Honor, I -- just to clarify the
12    request on 404, what I'm asking for is notice and disclosure,
13    but primarily notice of an intent to introduce evidence.  And
14    so the fact that it may be included among other discovery is
15    enough is not what I'm asking for.  I'm asking that the Court
16    direct that actual notice be given so we can know the universe
17    of this type of evidence so that we can effectively litigate
18    its admissibility.
19              THE COURT:  Okay.  All right.  Anything else with
20    regard to motions?  Oh, we have a new person speaking.
21              MR. KOVATS:  Not on the motions, Your Honor.
22    Charles Kovats on behalf of the United States.  I can wait.
23    This is on the transcript --
24              THE COURT:  Oh, yep -- oh, go ahead.  We have
25    exhibits -- let's see.  We have Exhibits 1, 2, 3, and 4 --
```

1          MR. KOVATS:  I believe all four --

2          THE COURT:  -- that have been received.

3          MR. KOVATS:  Yes, Your Honor.  So as to 2, which is

4   the transcript of the interview --

5          THE COURT:  Okay.

6          MR. KOVATS:  -- or the video, and then the

7   transcript, we propose, Your Honor, the opportunity to

8   substitute a redacted copy of the paper transcript to protect

9   the identity of Witness 1 who is named in the paper

10  transcript.

11         THE COURT:  I see.

12         MR. KOVATS:  And then, if possible, we'd like to

13  then seek leave of the Court to seal the actual video, given

14  that the public would get -- we would argue, anyway, here --

15  the content of what occurred by way of the paper transcript.

16  And that would satisfy the public's need to know as to what

17  happened during the course of that interview of the Defendant.

18         And then secondarily, in the -- on the subject

19  matter of transcripts, we would just ask when this Court

20  considers the briefing schedule that we would account for -- I

21  think we could do a better product if we had a transcript of

22  the witness' testimony to work from.  So if we just included

23  that and built it into the timeline.

24         THE COURT:  Special Agent Ball, you mean?

25         MR. KOVATS:  Yes, Your Honor.

1            THE COURT:  I see.

2            MR. KOVATS:  Thank you.

3            THE COURT:  All right.  I guess, Mr. -- you even

4    stood just as I said your name.  My guess is that you wanted

5    to -- you would like to, as I allowed you to intervene at the

6    beginning, now that there's been a different motion for either

7    redaction or sealing of something, you might as well go ahead

8    and get your position now.

9            MR. BORGER:  First of all, Your Honor, just as a

10   matter of housekeeping, with your order to unseal the exhibits

11   that were previously filed, I just ask that you communicate

12   that to the Clerk with some dispatch so there's access to that

13   in a prompt manner.

14           With respect to the motion to substitute a redacted

15   version of the transcript with the identity of the witness

16   redacted, I'm assuming that this is a confidential informant

17   of some sort and that they can make an appropriate showing,

18   but I think that they ought to be directed to make that

19   showing.

20           THE COURT:  Okay.

21           MR. BORGER:  And that, in the meantime, while

22   they're making that showing, that the redacted version be made

23   available right away.

24           With respect to the video, since that has been

25   received in evidence and is now a judicial record, we would

1    ask for access to that at least for purposes of viewing

2    because tons of voice inflection, pauses and so forth that may

3    not be reflected in the written transcript may cast some light

4    for purposes of public information about the process.  And my

5    client may find news value in observing those materials, so we

6    would oppose the motion to seal the video.

7              THE COURT:  Okay.

8              MR. BORGER:  To the extent that its contents are

9    completely revealed, other than perhaps the name of the

10   confidential informant, we think that access to the video

11   ought to be coextensive with access to the transcript.  So,

12   the same portions that are made available in the written

13   transcript, the corresponding video portions ought to be made

14   available.

15             THE COURT:  Okay.

16             MR. BORGER:  And then finally, Your Honor, with

17   respect to the closed hearing which you held earlier today --

18             THE COURT:  Right.

19             MR. BORGER:  I had asked some questions about your

20   intent.  That was perhaps overly brief.  I would say that it

21   is an unusual procedure to close that sort of an argument

22   because legal arguments for closure typically are made on the

23   open record and that discussions of the material to be --

24   sought to be closed can be made, often are made, on the public

25   record.  So, I think that the standards for sealing are the

1   same.  I understand the concerns that you had expressed about

2   the need for candor from the parties and the ability of the

3   Court to ask the appropriate questions.  But I think the same

4   kind of searching inquiry needs to be made for that

5   proceeding, and at least portions of that could be made

6   public.

7           I would simply at this point reserve the right to

8   make a later motion for access to that sealed proceeding,

9   closed proceeding, depending upon the desires of my client

10  after I've had a chance to consult with them, because I don't

11  mean to be making unnecessary motions or motions that my

12  client has not directed me to make.

13          THE COURT:  Okay.  All right.  Very good.  And of

14  course with any of my rulings, particularly with the

15  dispositive rulings, the dispositive reports and

16  recommendations and any orders that come out of here will be,

17  of course, for Judge Montgomery to review.  Mr. Mohring, did

18  you have anything to say about the last motion -- or last

19  discussion regarding that?  I forgot to ask you.

20          MR. MOHRING:  Yes, Your Honor.  I think the initial

21  concerns -- and I don't think that I give anything away in

22  saying this -- had to do with the privacy of private

23  individuals.  I think that we have now crossed a very

24  significant line into access to evidence that is evidence --

25  that will be evidence of the Prosecution's case-in-chief.  And

```
 1    so we've gone from one set of considerations to another, which
 2    is the possible impact on the jury pool of disclosures of --
 3    that are made at this point.  And that's a whole other
 4    concern, one that has not been voiced yet.  But I think that
 5    one that is directly implicated based on the disclosures that
 6    are now being contemplated.  And so I would renew the motion
 7    that the exhibits be -- that the specific exhibits -- the
 8    transcript of the interrogation and the video and audio of the
 9    interrogation -- be sealed at present based on that additional
10    and supplemental concern, which is now directly implicated by
11    what it is that it would -- without that would happen.
12              THE COURT:  Okay.  Well, I think maybe what's
13    appropriate since we kind of have a new set of things, I ruled
14    on what had been previously filed, now we have a different set
15    of information that, on the one hand, one party is asking to
16    seal, on the other to be at least redacted, and then the third
17    as far as the intervenor to release it all or at least, for
18    sure, the redaction at this point.  I am going to ask for
19    briefing -- brief briefing, because we -- I don't know from
20    what -- now that we have a little bit different set of
21    circumstances, Mr. Mohring now has mentioned the impact of the
22    jury and evidence that's going to be used.  I don't know if
23    there's a public safety issue or a witness safety issue.  I
24    don't know what I've got here, so now I need some briefing on
25    those, which will then allow Mr. Borger to respond, and then
```

```
 1  we'll go from there.
 2           But I'd like this to be done quickly.  It's an open
 3  hearing, so there's certainly information that the public has
 4  now.  With regard to the exhibit -- Exhibit Numbers 2 and 3,
 5  then, I will ask for briefing.  I really want that all to be
 6  done by the end of the week, so I'd like briefing on motions
 7  to either seal it or keep it redacted with as much information
 8  as you can give me -- let's see.  What's today, the 23rd?  I'd
 9  really like to see that -- I'd like to see that by Thursday so
10  that I can get a response by Friday so that we know where we
11  are by the end of this week.
12           Mr. Kovats, were you going to say something?
13           MR. KOVATS:  Just to be clear, then are Exhibits 2
14  and 3 now under seal again?
15           THE COURT:  Um, they will not be released at this
16  time since Mr. Mohring has been -- has moved to actually seal
17  the whole thing.  So, 2 and 3 will not be released at this
18  time until I rule on the motion for sealing.
19           MR. KOVATS:  Thank you, Your Honor.
20           THE COURT:  All right.  And then Mr. -- and then
21  I'll allow the intervenor to respond, and I'll make my ruling
22  by Friday whether they're going to be sealed, whether they're
23  going to be issued with -- allowed to be set forth with
24  redactions -- not set forth, but you know what I mean -- but
25  out in public; and/or whether there be a complete unsealing
```

1    and allowing that all to be public.

2              MR. BORGER:  Your Honor --

3              THE COURT:  You can't speak from back there.  You

4    have to come up here because it won't record.

5              MR. BORGER:  Just a point of clarification.  The

6    motions to seal and redact and so forth will only be directed

7    to Exhibits 2 and 3 that were just today --

8              THE COURT:  Correct, correct.

9              MR. BORGER:  And presumably the sealing of the

10   transcript of the closed proceedings, as well.

11             THE COURT:  That I've ruled upon as sealed, and I

12   ruled upon that in terms of the -- being able to have a candor

13   of the parties that are asking for sealing.  And that was part

14   of today's proceedings.  I've ruled that that has been sealed.

15   If you want to expound on that, I'll give you an opportunity

16   to in writing, but that may be something you'll just have to

17   take up if you're going to -- to Judge Montgomery.

18             MR. BORGER:  Thank you, Your Honor.  And just again

19   to be clear, the exhibits that you unsealed remain unsealed,

20   right?

21             THE COURT:  Correct.  And maybe the wording is best

22   to say the motions -- you wouldn't have known what they are,

23   the documents that were filed, numbers 36 through 41, will be

24   unsealed.  I am only talking about the Exhibits 2 and 3 that

25   have been submitted in this hearing today.

1          MR. BORGER:  Okay.  Thank you, Your Honor.

2          THE COURT:  All right.  With those directions, we'll

3    take it all under advisement, and we'll be in recess for now.

4    Thank you all for being patient as we work through the lunch

5    hour.

6          UNIDENTIFIED MALE:  I apologize, Your Honor, did the

7    Court set a schedule for briefing -- I understand we're

8    talking about briefing just on the sealing question --

9          THE COURT:  Oh, yes, yes, yes.  It seems to me -- I

10   wanted to do less than a two-week time period.  I know we

11   don't have a formal trial date quite yet.  We may have one out

12   there; I'm not sure Judge Montgomery has it specifically.  So

13   my thought was a 10-day period for the defense.

14         Mr. Mohring, do you think -- let's see, how

15   normally -- there will be something that will be transcribed

16   just through the digital recording --

17         MR. MOHRING:  I can tell you, Your Honor, that it's

18   unlikely that we will choose to spend money to order a

19   transcript.

20         THE COURT:  All right.  Mr. Winter?

21         MR. MOHRING:  Certainly not on an expedited basis.

22   I'm pretty much forbidden from that luxury.

23         THE COURT:  Well, I understand that there are grave

24   budget concerns right now across the Federal Public Defender

25   system which seems quite unfortunate, but --

1          MR. MOHRING:  But ten days would be fine.

2          THE COURT:  Why don't we do a 10-dayer, and then if

3     the Government is -- also has some other budget issues, but if

4     they want to order an expedited, then you should right away so

5     that you can all have it.  It's not absolutely necessary, but

6     I can understand the desire to have it.  So, the 10-day period

7     would be -- and I always go from -- figuring today is kind of

8     lost, so how about -- can you do it -- Mr. Mohring, I'd really

9     like to do it by August 2nd, just short of ten days.

10          MR. MOHRING:  Is that a week from tomorrow?

11          THE COURT:  No, that's a week from Friday.

12          MR. MOHRING:  That would be fine.

13          THE COURT:  August 2nd.  I'm not going to give the

14     Government quite as long.  You can have until August 7th to

15     get your reply in.  I think the issues are pretty teed up, but

16     I'll give you a little bit of time to respond.  So,

17     August 7th, that gives us some time.  And we'll let Judge

18     Montgomery know what your briefing schedule is so that then

19     there can be plenty of time with whoever wants to bring any

20     issues up to Judge Montgomery based on what we rule.

21          I'll tell you on the non-dispositive motions, we'll

22     put that out quickly because that will -- that we can get out

23     as we normally do.  All right.  Very good.  We'll be in

24     recess.

25          MR. MOHRING:  I'm sorry, Your Honor, one last thing.

```
 1    On the sealing question, Government Exhibit 1 is the search
 2    warrant but also the application for the search warrant and a
 3    number of exhibits that were attached to that.  I would ask
 4    leave of the Court to include that within the scope of the
 5    briefing and to have that exhibit also included within the
 6    scope of what's not going to be released just yet until that
 7    briefing happens.  The Affidavit in support of the motion
 8    includes a number of things that trigger the same concerns
 9    about the jury pool, and I'm just asking for leave to brief
10    that.
11              THE COURT:  Mr. Winter or Mr. Kovats?
12              MR. MOHRING:  And if I could even -- the warrant
13    itself, I have no problem with that.  It's the documents that
14    substantiate it and that were filed in support of it that I'm
15    focusing on in particular.
16              MR. WINTER:  Your Honor, our position, at least that
17    we advanced to the Court of Exhibits 2 and 3 was the safety of
18    the witness.  It's not as stated by the witness.  This isn't a
19    Government source; this is an ordinary citizen witness that
20    came forward and provided information.  We'd like to protect
21    that witness.  The Government, I think, did protect that
22    witness adequately in Exhibit 1, and so we don't have concerns
23    about Exhibit 1.
24              THE COURT:  Mr. Mohring, I -- in looking through the
25    exhibits, you know, that I have been able to at least go over
```

1   pretty quickly and I just don't see that that has anything

2   different from what was testified to and/or discussed that I

3   actually overruled already.  So, I'm going to go ahead and

4   deny that motion as to Exhibit Number 1.

5            MR. MOHRING:  All right.

6            THE COURT:  All right.  We will be in recess now.

7            **(WHEREUPON, the matter was adjourned.)**

8            **(Concluded at 1:03 p.m.)**

9

10

11                   *      *      *      *

12                        CERTIFICATE

13

14       The foregoing transcript is a transcription of the

15   digital audio recording that was produced in the above matter

16   by Court staff and later submitted to myself, Heather A.

17   Schuetz, for transcription. An official court reporter was not

18   present to produce a stenographic and verbatim record of the

19   aforementioned's proceeding at the time and place specified

20   herein.

21

22            Certified by: s/ Heather A. Schuetz_____
                            Heather A. Schuetz, RMR, CRR, CCP
23                          Official Court Reporter

24

25

Heather A. Schuetz, RMR, CRR, CCP
(651) 848-1223
Heather_Schuetz@mnd.uscourts.gov