## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

United States of America,

Plaintiff,

v.

Buford Braden Rogers,

Defendant.
_____

Case No. 13-cr-130 (ADM/JJG)

REPORT AND RECOMMENDATION

JEANNE J. GRAHAM, United States Magistrate Judge

This matter is before the undersigned United States Magistrate Judge on Defendant Buford Braden Rogers' Motion to Suppress May 3, 2013 Statements, Admissions, and Answers (ECF No. 31) and Motion to Suppress Evidence Obtained as a Result of the May 3, 2013 Search and Seizure (ECF No. 33). The Court held a hearing on the motions on July 23, 2013. Andrew R. Winter and Charles J. Kovats, Jr. appeared on behalf of the United States of America, and Andrew H. Mohring appeared on behalf of Defendant Buford Braden Rogers. For the reasons set forth below, the Court recommends that both motions be denied.

Defendant Buford Braden Rogers ("Rogers") was indicted on May 21, 2013, with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and three counts of possession of unregistered destructive devices—namely, two Molotov Cocktails, two black powder and nail devices, and a pipe bomb—in violation of 26 U.S.C. §§ 5861(d) and 5871. This Court held an evidentiary hearing on Rogers' motions to suppress evidence and statements on July 23, 2013. At that hearing, the Government called FBI Agent Shane Ball to testify. The Government also offered the following exhibits into evidence

for the limited purpose of the suppression hearing: Government Exhibit 1—a search warrant executed on May 3, 2013, and related paperwork; Government Exhibit 2—a digital videorecording of an interview of Rogers; Government Exhibit 3—a transcript of that interview; and Government Exhibit 4—an Advice of Rights form. At the conclusion of the hearing, the parties requested an opportunity to submit post-hearing memoranda on Rogers' motion to suppress statements, which the Court granted. The Court took both suppression motions under advisement on August 7, 2013, after briefing was completed.

## I.    Rogers' Motion to Suppress Evidence Seized Pursuant to the Search Warrant Executed on May 3, 2013

A team of law enforcement officers executed a search warrant at 1204 Benson Road, Lot 8, in Montevideo, Minnesota ("Benson Road"), on May 3, 2013. (Gov't Ex. 1 at 1.) The location was described as a residential trailer home, a storage shed, and other storage buildings or vehicles on the property. (*Id.*) Rogers moves to suppress the evidence seized pursuant to the warrant on the ground that the warrant was issued without probable cause.

### A.    Probable Cause

Rogers' motion to suppress evidence should be denied because probable cause existed for the issuance of the search warrant. Rogers does not identify any particular deficiency with the probable cause determination by the issuing judge, and the Court presumes Rogers simply wants the Court to review the four corners of the supporting affidavit.

The probable cause standard is a "practical, nontechnical concept[]." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). The duty of the judge who signs the warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit must establish a

"nexus . . . between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307 (1967). There must also be a nexus between the contraband and the place to be searched. *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). In reviewing a search warrant for probable cause, the Court must give "great deference" to the issuing court's original determination. *Gates*, 462 U.S. at 236 (quotation omitted). If the issuing judge relied solely on the affidavit in assessing probable cause for the warrant, the reviewing court may consider "only that information which is found within the four corners of the affidavit . . . in determining the existence of probable cause." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982).

FBI Agent Marc Rensch swore the affidavit in support of the warrant. Agent Rensch averred that an individual referred to as "Witness 1" had informed an FBI agent in San Antonio, Texas, on May 2, 2013, that Rogers and his family were planning to destroy a radio tower or communications equipment in the City of Montevideo, raid the National Guard armory, and attack the Montevideo police station. Witness 1 had met Rogers in Arizona in the fall or winter of 2012, and after a conversation about their shared dissatisfaction with the economy and the government, Witness 1 moved to Minnesota and lived with Rogers' parents. While in Minnesota, Witness 1 learned that Rogers, his brother, and his parents were members of the Black Snake Militia and carried weapons at all times. Witness 1 further learned that Rogers stored numerous weapons and explosive devices in a storage shed outside his parents' home and in a toolbox inside the home. Witness 1 was able to describe the various weapons he had seen. According to Witness 1, Rogers also possessed homemade napalm, Molotov cocktails, homemade thermite, C4, and other explosive materials. Witness 1 saw Rogers personally detonate several explosives. On April 28 or 29, 2013, Rogers told Witness 1 that he planned to attack the City of Montevideo the next weekend. After Witness 1 balked at participating, Witness 1's girlfriend heard Rogers

say that "Witness 1 'knew too much' so they had to 'take him out.'" (Gov't Ex. 1, Rensch Aff. ¶ 7(h).) Witness 1 and his girlfriend immediately left Minnesota and fled to San Antonio, where Witness 1 contacted the FBI.

According to Agent Rensch's affidavit, on May 2, 2013, Agent Rensch learned that a citizen of Montevideo, who was also a friend of the Rogers family, had reported the following information to the Montevideo Police Department on February 8, 2013. This individual, identified in the search warrant affidavit as "Witness 2," saw Rogers and his father arrive at the Benson Road address and carry four rifle cases into the trailer home. Witness 2 saw a long gun stock protruding from one of the cases. Witness 2 had previously seen Rogers and his father "training" several times outside the Benson Road trailer, throwing knives at targets, practicing "takedown moves," and engaging in hand-to-hand combat.

Based on the information obtained from Witness 1 and Witness 2 and Agent Rensch's independent investigation, Agent Rensch requested a search warrant to seize firearms, ammunition, explosives, chemicals, military ordnance, cords, fuses, gas cans, detonators, fuel, fertilizer, and other similar items, as well as documents, personal property, and other materials related to such items. He averred the items would constitute evidence of crimes as defined under 18 U.S.C . §§ 842(a)(1), 842(a)(3)(A), 842(a)(3)(B), 922, and 2332f(2).

The Court has reviewed the affidavit and finds it provided probable cause to believe that law enforcement would find contraband or evidence of a crime in the residence, storage buildings, or vehicles located at the Benson Road address. The affidavit established a nexus between the items to be seized and the crimes specified in the application. The affidavit also established a nexus between the items and location to be searched. Accordingly, Rogers' Motion

to Suppress Evidence Obtained as a Result of the May 3, 2013 Search and Seizure should be denied.

### B. Expectation of Privacy[1]

Agent Ball testified at the hearing that Rogers' parents, brother, and a person named Dylan lived at the Benson Road residence and that Rogers did not live there. (Mot. Hr'g Tr. 46:4-15, 47:6-13, July 23, 2013) [hereinafter Tr.]. At the time the warrant was executed, Agent Ball knew Rogers lived elsewhere. (Tr. 46:16-20.) Rogers was not at his parents' home when the warrant was executed, but was taken into custody at his own residence while the search was underway. (Tr. 43:22-25, 44:1-4, 49:4-12.)

To prevail on a Fourth Amendment challenge to a search or seizure, "the defendant must show that (1) he has a reasonable expectation of privacy in the areas searched or the items seized, and (2) society is prepared to accept the expectation of privacy as objectively reasonable." *United States v. Skoda*, 705 F.3d 834, 837 (8th Cir. 2013) (quoting *United States v. Ruiz-Zarate*, 678 F.3d 683, 689 (8th Cir. 2012)). The defendant bears the burden to establish each element. *See United States v. James*, 534 F.3d 868, 872-73 (8th Cir. 2008). An individual has no legitimate expectation of privacy in his or her parents' home when he or she does not live there. *Skoda*, 705 F.3d at 837.

Rogers has not claimed an expectation of privacy in the Benson Road residence or in any of the items seized. The only relevant evidence before the Court is that Rogers' parents and brother lived at the Benson Road address, that Rogers neither lived there nor was present at the time of the search, and that Rogers lived at a different address. Although the FBI believed that

---

[1]     Neither party discussed whether Rogers had a legitimate expectation of privacy in the Benson Road address or the items seized, and the Court finds it an arguable question. Therefore, the Court will briefly address the issue.

Rogers was storing weapons and explosive devices at the Benson Road property, according to the information obtained from Witness 1, Rogers has not claimed or shown a possessory or ownership interest in those items. Consequently, the Court finds that Rogers has not established a reasonable expectation of privacy in the area searched or the items seized.

## II.     Rogers' Motion to Suppress May 3, 2013 Statements, Admissions, and Answers

Rogers was interviewed by Agent Ball on May 3, 2013, during the execution of the search warrant. He moves to suppress statements made during the first part of the interrogation because he was not advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to being questioned. Rogers does not argue that his statements were involuntary. The Government responds that Agent Ball was not required to advise Rogers of his *Miranda* rights, because the questioning fell under the public safety exception to *Miranda* recognized in *New York v. Quarles*, 467 U.S. 649 (1984). The Government concedes that Rogers' statements were the product of custodial interrogation.

Approximately forty minutes into the interview, Agent Ball advised Rogers of his *Miranda* rights and continued to question him. Presuming that his pre-*Miranda* statements did not fall under the *Quarles* exception, Rogers moves to suppress his ensuing statements as obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). The Government argues that since the pre-*Miranda* statements were obtained lawfully under *Quarles*, the Court need only assess the voluntariness of the post-*Miranda* statements and validity of the waiver.

### A.     Background

Based on the information provided by Witness 1, Agent Ball and other law enforcement personnel believed Rogers and others intended to attack the Montevideo police department, a communications tower, and/or the National Guard armory on May 4, 2013. (Tr. 16:5-8, 19-23.)

6

Agent Rensch obtained the search warrant at 11:05 a.m. on May 3, 2013, and the warrant was executed shortly thereafter. (Gov't Ex. 1.)

The Boston Marathon bombings had occurred three weeks earlier and were forefront in the minds of Agent Ball and the other law enforcement officers involved in the investigation. (Tr. 66:3-10.) From the information given by Witness 1, Agent Ball believed Rogers was a member of a militia or hate group and that he had cheered the Boston bombings when they occurred. (Tr. 66:10-16, 22-25.) The four Rogers family members were believed to be the primary members of an organization known as the Black Snake Militia. (Tr. 78:15-21.) Agent Ball had learned that, on a previous occasion, Rogers' father had fired a weapon at police officers through the front door of the Benson Road trailer home. (Tr. 68:1-9.) Due to concerns raised by the Boston bombings, the Rogers family's militia or hate group affiliation, and Rogers' father's prior act of violence against police officers, the FBI decided to utilize armored vehicles and a SWAT team in executing the search warrant. (Tr. 68:10-22.) About fifty SWAT team members, bomb technicians, and other law enforcement personnel participated in the execution of the warrant. (Tr. 15:17-25, 42:7.)

Arriving at the Benson Road property, officers first noticed a large "BSM" sign and an upside-down United States flag outside the trailer home. (Tr. 67:5-9.) According to Agent Ball, a United States flag is flown upside-down to signal duress, typically by ships. (Tr. 79:4-8.) Rogers was not present at the Benson Road residence when the warrant was executed, but his mother, father, brother, and an individual identified as Dylan were there. (Tr. 43:22-25, 44:1-4.) None of the four individuals resisted the execution of the warrant. (Tr. 44:11-12.)

Soon after the trailer home and the individuals were secured, bomb technicians and other searching officers located two Molotov cocktails, a containerized explosive device wrapped in

duct tape, and a containerized explosive device wrapped in cloth, all with fuses attached, in the trailer home. (Tr. 17:1-10, 71:8-12.) In accordance with standard procedure, the bomb technicians x-rayed the devices and eventually removed them from the area and rendered them safe. (Tr. 17:13-20.) Searching officers also found eight to ten guns and ammunition at the Benson Road property. (Tr. 18:4-10.)

While the search was underway, agents located Rogers at his residence in another part of Montevideo, took him into custody, and transported him to the Montevideo Police Department (Tr. 18:16-21, 23-24.) They told Rogers a search warrant was being executed at his parents' home and that Agent Ball wanted to speak with him. (Tr. 49:7-12.) Given Agent Ball's belief that the attack was planned for the next day, he wanted to talk to Rogers immediately to garner information about the number and types of explosives at the search site as well as details about the alleged plot. (Tr. 19:6-13.)

Agent Ball met Montevideo Police Chief Adam Christopher at the police department. (Tr. 19:21-22.) Together, they went into an interview room where Rogers was sitting. (Tr. 19:23-24, 20:1-2, 21:5-7). Agent Ball considered Rogers in custody and not free to leave. (Tr. 20:24-25, 21:1-4.) About ten minutes had passed since Rogers was taken into custody. (Tr. 49:17-19.) The interview began at approximately 1:00 to 1:15 p.m. (Tr. 50:5-9, 12-14.) Agent Ball did not advise Rogers of his *Miranda* rights at the outset of the interview because he wanted to proceed under the public safety exception to *Miranda*. As the agent testified,

> We utilized the public safety exception, specifically because we had solid information that a plot was in the works, that an individual had weapons, explosives, and knowledge, wherewithal, those things, in order to commit a plot. When we arrived at the scene, we found weapons and explosives, incendiary devices consistent with what we found. So, at that time the bigger, overriding factor of what we're doing that day was to establish the -- how many devices are there, how many weapons are there,

8

> what's out there, is he capable of committing these sort of acts, are there any other co-conspirators, types of devices, how are they triggered, what are the mechanisms, those sorts of things.

(Tr. 25:11-22.) Agent Ball began the interview by telling Rogers there was "a pretty serious public safety issue. . . . Like people can get hurt. You know, neighbors, friends, people in the community, that sort of thing." (Gov't Ex. 3 at 102.)

Just before the interrogation began, officers at the Benson Road property had discovered several actual explosive and incendiary devices at the search scene, which Agent Ball took to confirm a real and present plot. (Tr. 56:14-18.) Although the two chemical components of the Molotov cocktails had separated within the containers, the containers were sitting on a shelf in the residence and had wicks attached. (Tr. 60:12-13, 60:19-25, 61:1-3, 61:13-14.) Other devices were also fused for detonation. Agent Ball was concerned with the safety of the officers and bomb technicians at the scene, as well as people in the neighborhood. (Tr. 26:3-7.) He needed to learn more about the alleged plot. (Tr. 56:14-15.)

Agent Ball showed photographs of some of the explosive devices to Rogers and asked him questions about how they were made and how they were meant to be detonated. (Tr. 71:17-19.) He asked Rogers whose fingerprints were on the explosive devices so that the bomb technicians could ascertain how they were made and how to handle them safely. (Tr. 72:1-6.) Agent Ball explained at the hearing that the person who made the devices would be able to give much more accurate information than someone who had only heard how they were made, for example. (Tr. 75:19-24.) Also, Agent Ball wanted to know if he needed to widen the investigatory net to look for additional plot participants, mindful that Witness 1 had said the attack was planned for the next day. (Tr. 80:8-10, 16-20.)

Agent Ball also asked Rogers several questions about which guns he had handled, which guns he owned, which guns would have his fingerprints or DNA on them, and who had shot weapons with Rogers at the shooting range. (Tr. 63:11-22, 63:25, 64:1-2.) Agent Ball also asked Rogers about some of the characteristics and configurations of the weapons that had been found. (Tr. 64:5-9, 15-17.) The agent asked these questions to ascertain Rogers' capabilities, access to weapons, and competence with firearms. (Tr. 72:21-25, 73:1.) With regard to shooting guns at the range, Agent Ball wanted to determine if others were involved in the alleged plot or had trained or taught Rogers about firearms or weapons. (Tr. 73:2-8.) Agent Ball asked Rogers about some of his family's property north of Montevideo to learn whether weapons and explosives were stored there. (Tr. 72:13-20.)

About forty minutes into the interview, Agent Ball advised Rogers of his *Miranda* rights by reading from the FBI's standard Advice of Rights form. (Tr. 26:15-19, 27:10-14; Gov't Ex. 4.) Rogers appeared to understand his rights and waived them. (Tr. 28:21-23, 29:8-10.) Because Rogers was handcuffed at the time, Ball noted "verbal" on the signature line after Rogers acknowledged his rights and agreed to continue with the interview. (Tr. 28:7-13.) The interview continued without a break at that time, and Rogers continued to answer questions. (Tr. 29:11-14, 65:5-7.)

The post-*Miranda* portion of the interview consisted of about two hours of additional questioning and two breaks. (Tr. 29:15-21.) Some of the questions mirrored the pre-*Miranda* lines of questioning such as who owned certain items discovered at the Benson Road address, the extent to which Rogers had handled those items, whether Rogers' fingerprints would be found on the items, and Rogers' activities at the shooting range. (Tr. 65:8-15, 74:3-5, 74:11-13.) At some point, Rogers' handcuffs were either removed or adjusted so that he could have his hands in front

of his body. (Tr. 53:9-15.) After the first break, Agent Ball reminded Rogers of his *Miranda* rights and verified that Rogers continued to understand his rights. (Tr. 30:9-13.) The interview ended when Agent Ball left to deal with another aspect of the investigation. (Tr. 30:1-3.)

Throughout the entire interrogation, Rogers was calm, articulate, engaged, responsive, and coherent. (Tr. 21:11-13, 22:1.) He did not appear under the influence of drugs or alcohol. (Tr. 21:18-22.) He did not appear fatigued or emotionally distraught. (Tr. 22:4-9.) He was given water to drink. (Tr. 23:25.) Rogers was in his late twenties at the time. (Tr. 22:12-13.) Neither Agent Ball nor any other law enforcement officer threatened Rogers. (Tr. 22:14-17.) The total length of the interview, including two breaks, was a little more than three hours. (Tr. 22:18-21, 23:5-9.) It ended at about 5:52 p.m. (Tr. 50:15-18.) Rogers never asked to end the interview or for an attorney. (Tr. 23:13-15, 19-22.) Agent Ball learned after the interview that Rogers had been advised of his *Miranda* rights on two previous occasions, in 2007 and 2010, by Montevideo police officers. (Tr. 30:14-23, 70:10-12.) Rogers waived his rights and gave a statement to the police both times. (Tr. 70:14-15, 18.)

### B.     Voluntariness

Although Rogers does not argue that his statements were involuntary, the Court will briefly discuss the issue of voluntariness. For a statement to be admissible as evidence, it must be "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Due process is offended if the individual's "will has been overborne and his capacity for self-determination critically impaired." *Id.* (quoting *Culombe*, 367 U.S. at 602). In assessing voluntariness, the Court considers the totality of the circumstances, including "the characteristics of the accused and the details of the interrogation." *Id.* at 226. Some relevant factors include the

individual's age, education, and intelligence; whether a *Miranda* warning was administered; the length and conditions of custody; and the nature of the questioning. *Id.*

In the case at hand, Rogers is an adult with at least average intelligence. Throughout the interview, he was calm, articulate, engaged, responsive, and coherent. He did not appear under the influence of drugs or alcohol, nor did he appear tired or emotionally distraught. The interview occurred in an interview room at the police station. Rogers was offered water and bathroom breaks, and his handcuffs were readjusted from his back to his front. Agent Ball's tone was courteous and direct. The agent made no threats or promises, and he did not pressure or trick Rogers in any way.

Agent Ball advised Rogers of his *Miranda* rights approximately forty minutes into the interview. Rogers indicated he understood those rights and waived them. Rogers continued to speak with Agent Ball for about two more hours. Rogers has experience with the criminal justice system and has received *Miranda* warnings at least twice before. Both times, Rogers waived his rights and spoke with the officer. Having considered all of the relevant circumstances, the Court concludes that Rogers' statements were voluntary.

### C.      Statements Made Prior to the *Miranda* Warning

The Government may not introduce at trial any statement of a defendant obtained from a custodial interrogation unless the individual was first advised of certain rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). These advisories are required "to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010)

(quoting *Miranda*, 384 U.S. at 467). *Miranda* warnings are not constitutionally required but are a judicially-created prophylactic measure intended to protect an individual's privilege against self-incrimination. *United States v. Patane*, 542 U.S. 630, 636-37 (2004).

In *New York v. Quarles*, the Supreme Court recognized an exception to *Miranda*'s advice-of-rights requirement when "police officers ask questions reasonably prompted by a concern for the public safety." 467 U.S. 649, 656 (1984). The underlying rationale for the exception is "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657.

The *Quarles* suspect had discarded a gun in a grocery store while being pursued by police officers. *Id.* at 652. After apprehending the suspect, one of the officers asked him where he had thrown the weapon. *Id.* The suspect nodded toward an area and said, "the gun is over there." *Id.* Recognizing the officer's immediate need to determine the location of the gun to ensure the safety of the public, the Court remarked that had the officer been required to recite *Miranda* warnings first, the suspect could have been deterred from answering. *Id.* at 657. The Court explicitly declined to place officers "in the untenable position" of having to decide in the heat of the moment whether society would be better served by asking questions without a *Miranda* advisory and neutralizing the dangerous situation or by advising a suspect of his rights and safeguarding the admissibility of any evidence obtained. *Id.* at 657-58. Although the Court classified the public safety exception as narrow, the Court declined to set specific parameters, trusting police officers to distinguish instinctively "between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658-59.

When assessing the questions asked by an officer in exigent circumstances, a court does not consider the officer's motivation. *Id.* at 656. ("In a kaleidoscopic situation . . ., where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception . . should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer."). Naturally, most officers in this situation "would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect." *Id.* The *Quarles* Court was not concerned that the police officer wanted both to protect the public and to obtain evidence for the investigation. *Id.* at 657.

In the present case, law enforcement agents faced an imminent threat to public safety at the time of Rogers' interrogation. Agents had recently learned from a confidante of Rogers of an imminent plot by Rogers and possibly others to commit a large-scale attack involving explosive and incendiary devices at several public locations. Officers searching the Benson Road address had just discovered several explosive and incendiary devices, firearms, and ammunition, corroborating the information obtained from Witness 1 and making the prospect of violence very real indeed. This was no single gun in a grocery store. The explosive and incendiary devices were fused and readily accessible. Bomb technicians were in the process of examining and attempting to defuse the devices. The searching officers and bomb technicians were at significant risk, as were individuals in the surrounding community, at the very moment Rogers was being interviewed. Searching officers did not know where other explosive and incendiary devices might be located or whether other individuals were prepared to use them. As *Quarles* directed, the public safety exception "in each case . . . will be circumscribed by the exigency which

justifies it." 467 U.S. at 658. In this case, the rapidly evolving and highly dangerous circumstances demanded that the imminent threat to public safety be defined broadly.

To ensure the safety of officers at the scene and the surrounding community, Agent Ball needed information about the nature and quantity of the explosive and incendiary devices, how they were made, how they were intended to be detonated, and whether any other devices, components, or chemicals existed on the property or elsewhere. Agent Ball needed to know who made the devices so that he could talk to the most informed person about their characteristics. He needed to know who else had access to similar devices or weapons and who else was involved in the alleged plot to determine if there were others ready and capable of carrying it out. *See United States v. Abdulmutallab*, No. 10-20005, 2011 WL 4345243, at *5 (E.D. Mich. Sept. 16, 2011) (finding the public safety exception applied to a fifty-minute interrogation aimed at similar information).

As for the firearms and ammunition, searching officers needed to secure these items immediately for their own safety and the safety of the public. They needed to know where the weapons were and who had the capability to use them. Law enforcement agents had information that the Rogers family and possibly a few others were involved in a militia or hate organization. Although officers believed the four immediate members of the Rogers family comprised the primary members of the Black Snake Militia, officers did not know if other fringe members or supporters were in the vicinity or at large. They knew the Black Snake Militia was not a closed group, having previously accepted Witness 1 and Dylan into their confidence. Thus, even though Rogers was in custody and his immediate family accounted for, agents did not know if collaborators or supporters were armed elsewhere or preparing for the alleged attack. *See United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999) (finding statement admissible under

*Quarles*, explaining, "Although Williams' hands were cuffed behind his back when the officers asked him if they needed to be aware of anything else, the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons[] were present in the apartment . . . .").

To develop information about Rogers' potential collaborators and associates, Agent Ball asked Rogers about his and his associates' activities at the shooting range and his family's rural property. Agent Ball also asked Rogers several questions about his handling of the guns seized from the Benson Road property and his level of familiarity with those weapons. While these questions were more peripheral to the exigent public safety concerns at hand, the Court is satisfied that the questions fall within the exception. After all, questions concerned with the public safety in exigent circumstances "are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such circumstances," *United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004). Similarly, as noted by the Eighth Circuit in *Williams*, "[c]onditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to the *Quarles* Court's decision that an officer may forego announcement of *Miranda* warnings when public safety is threatened." 181 F.3d at 953 n.13.

In sum, the Court finds that Agent Ball's questions in the pre-*Miranda* phase of the interrogation were reasonably prompted by an immediate concern for public safety. Whether Agent Ball might have been motivated also by a desire to garner evidence is immaterial. *See Quarles*, 467 U.S. at 656. In addition, the Court has considered each question posed by Agent Ball, and while not every question was crafted meticulously, the Court has viewed the questions

in the context of the haste and urgency that created the public exigency, not in the calm and academic setting afforded by retrospective review. The Court recommends that Rogers' statements made prior to the *Miranda* warning not be suppressed.

### C.        Statements Made After the *Miranda* Warning

Rogers contends that his post-*Miranda* statements were obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, a divided Supreme Court rebuked a two-step interrogation strategy in which the interrogating officer deliberately obtained an unwarned confession, then advised the suspect of her *Miranda* rights and elicited a second confession covering the same ground. *Id.* at 604.

Rogers' argument is based on the premise that his pre-*Miranda* statements were obtained unlawfully. The Court has concluded, however, that those statements were elicited lawfully under the *Quarles* public safety exception to *Miranda*. In this circumstance, where the initial questioning of Rogers was lawful, *Seibert* does not apply. *See United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012) (where first statement was not obtained in violation of *Miranda*, instructing that *Seibert* does not apply); *United States v. Kiam*, 432 F.3d 524, 531 (3d Cir. 2006) (where first statement occurred during a border detention interview, and therefore was not subject to *Miranda*, holding that the second *Miranda*-ized statement was admissible); *United States v. Ferguson*, No. 10 Cr. 843 (LTS), 2011 WL 1347002, at *7 (S.D.N.Y. Apr. 4, 2011) (where first statement was admissible under *Quarles*, finding it unnecessary to determine whether the officer engaged in a deliberate two-step interrogation under *Seibert*); *United States v. Mastera*, No. CRIM. 04-50-P-S, 2004 WL 1770139, at *3 (D. Me. Aug. 6, 2004) (where initial statement was admissible because the suspect was not in custody at the time of questioning, stating that *Seibert* did not apply to suspect's subsequent *Miranda*-advised statements). *Oregon*

*v. Elstad*, 470 U.S. 298 (1985), which also involved an initial unwarned statement obtained in violation of *Miranda*, does not strictly apply for the same reason, *see Kiam*, 432 F.3d at 531-32, although this is a distinction without a difference. Whether the Court applies the *Elstad* standard or the due process test for voluntariness, the result is the same.

The Court has previously determined that Rogers' statements following the *Miranda* advisory were made voluntarily. *See supra* Section II.B. The Court now finds that the statements were also made knowingly. Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's waiver of his *Miranda* rights was made intelligently and knowingly, as well as voluntarily. *Miranda*, 384 U.S. at 444, 475. The Court's assessment of the waiver has two components. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the individual must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In analyzing the second element, the Court considers factors such as the person's background, experience with the criminal justice system, and conduct near the time of the interview. *See Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir. 1985).

Here, there is no evidence that Rogers was intimidated, coerced, or deceived at any point during the interrogation. Agent Ball treated Rogers courteously, and the questions he asked were clear and straightforward. Rogers' demeanor and responses confirm that he was not intimidated, tricked, or coerced. The Court finds that Rogers' decision to waive his *Miranda* rights was a free and deliberate choice.

Rogers is an intelligent adult and has experience with the criminal justice system. Before May 3, 2013, he had heard *Miranda* warnings twice before and waived his rights both times. He also indicated to Agent Ball that he understood his *Miranda* rights. Throughout the interview, Rogers was calm, articulate, engaged, responsive, and coherent. He did not appear under the influence of drugs or alcohol, and he was not visibly fatigued or upset. The Court finds that Rogers was fully aware of the nature of his rights and the consequences of abandoning them.

The Court concludes that Rogers' post-*Miranda* statements were knowing and voluntary and that his waiver of *Miranda* rights was valid. Accordingly, the Court recommends that Rogers' statements made after the *Miranda* advisory not be suppressed.

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant Buford Braden Rogers' Motion to Suppress May 3, 2013 Statements, Admissions, and Answers (ECF No. 31) be **DENIED**; and

2.      Defendant Buford Braden Rogers' Motion to Suppress Evidence Obtained as a Result of the May 3, 2013 Search and Seizure (ECF No. 33) be **DENIED**.

Dated: August 29, 2013

      s/ *Jeanne J. Graham*                  
JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **September 13, 2013**.

A party may respond to the objections within fourteen days of the objections being filed. Any objections or responses filed under this rule shall not exceed 3,500 words. The district judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the district judge is not required to review a transcript of the hearing in order to resolve the objections, the party making the objections shall timely order and cause to be filed within fourteen days a complete transcript of the hearing.