# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

   Plaintiff,

v.

Buford Braden Rogers,

   Defendant.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 13-130 ADM/JJG

___

Andrew R. Winter, Esq., and Charles J. Kovats, Jr., Esq., United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

Andrew H. Mohring, Esq., Office of the Federal Defender, Minneapolis, MN, on behalf of Defendant.

___

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for consideration of Defendant Buford Braden Rogers' Objection [Docket No. 74] ("Obj.") to Magistrate Judge Jeanne J. Graham's August 29, 2013 Report and Recommendation [Docket No. 71] ("R&R"). In the R&R, Judge Graham recommends denying Rogers' Motion to Suppress May 3, 2013 Statements, Admissions, and Answers [Docket Nos. 31 and 33]. After a thorough de novo review of the record and for the reasons stated below, Judge Graham's R&R is adopted in part and modified in part.

## II. BACKGROUND

The factual history of this dispute is more fully recited in Judge Graham's R&R and many facts are incorporated here by reference. See R&R at 6-11. Rogers was interviewed by FBI Agent Shane Ball on May 3, 2013, while in police custody. The FBI learned from an

informant that Rogers and others were planning to destroy a radio tower in Montevideo, Minnesota, raid the National Guard armory, and attack the Montevideo police station the following day, on May 4, 2013. Mot. Hr'g Tr. [Docket No. 56] 16:5-8, 19-23. The FBI had information Rogers was a member of a militia or hate group and that he had cheered the Boston Marathon bombings which had occurred three weeks earlier. Id. 66:10-16, 22-25. The FBI obtained a search warrant to seize firearms, ammunition, explosives, chemicals, military ordnance, cords, fuses, gas cans, detonators, fuel, fertilizer, and other similar items the FBI understood were to be used in the Black Snake Militia attack. Gov't Ex. 1 ("Application for Search Warrant"). The search warrant identified a residential trailer and surrounding storage sheds on Benson Road property owned by Rogers' parents ("Benson Road Property") as the location of these weapons. Id. On May 3, 2013, about fifty SWAT team members, bomb technicians, and other law enforcement personnel executed the warrant. Mot. Hr'g Tr. 15:17-25 42:7.

At the same time the search warrant was being executed at the Benson Road Property, law enforcement located Rogers at his residence. Id. 18:16-21. Officers took Rogers into custody and transported him to the Montevideo Police Department to be interviewed. Id. 18:23-24. Rogers was put in an interview room, where he was joined by Agent Ball and Montevideo Police Chief Adam Christopher. Id. 19:23-24, 20:1-2, 21:5-7.

Just before the interrogation began, officers at the Benson Road Property found two Molotov cocktails, a containerized explosive device wrapped in duct tape, and a containerized explosive device wrapped in cloth. All had fuses attached. They also found eight to ten guns with ammunition. Id. 17:1-10, 71:8-12, 18:4-10. Agent Ball believed these items confirmed the

danger of a plot to attack the radio tower, armory, and police station.  Id. 15:11-22.  About ten minutes after Rogers was taken into custody, Agent Ball began to question him.  Id. 49:17-19.  Agent Ball testified that at the outset of the interview he did not advise Rogers of his rights as established under Miranda v. Arizona, 384 U.S. 436 (1966), because he felt the public safety exception to Miranda applied to these circumstances.  Id. 25:11-22.

At the time the interview began, bomb technicians were in the process of searching for, examining, and attempting to defuse the devices.  Gov't Ex. 3 at 00000105.  Agent Ball testified he was concerned about the safety of the officers and bomb technicians at the scene.  Mot. Hr'g Tr. 26:3-7.  Agent Ball questioned Rogers about the location of any other explosives, whether Rogers made the devices and how they were made, the nature and extent of the plot, and whether others might be involved in planning the attack.  During the interrogation, Agent Ball relayed information to the bomb technicians and agents at the scene.  Gov't Ex. 3 at 00000106.  Agent Ball also questioned Rogers about firearms found at the Benson Road Property.

After approximately forty minutes,[1] Agent Ball read Rogers his Miranda rights.  Mot. Hr'g Tr. 26:15-19, 27:10-14; Gov't Ex. 4.  Rogers waived his rights, and Agent Ball continued to interview him.  Mot. Hr'g Tr. 28:21-23, 29:8-10, 29:15-21.  While the post-Miranda questioning covered a wider range of topics and background, some of the questions covered the same ground as the pre-Miranda questions.

### III.  DISCUSSION

In reviewing a magistrate judge's report and recommendation, the district court "shall

---

[1] Although the interview was recorded for approximately 40 minutes, there is a considerable period of no questions being asked.  The transcript of the pre-Miranda questioning is a relatively short 33 pages in length.

make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

## A. Uncontested Portions of the R&R

After a thorough pre-trial evidentiary hearing, Judge Graham found probable cause existed for the search warrant executed at the Benson Road Property on May 3, 2013. Consequently, Judge Graham recommends this Court not suppress evidence obtained as a result of the search warrant. Rogers does not object to this portion of the R&R and the Court adopts Judge Graham's recommendation.

Judge Graham also found that all of Rogers' May 13, 2013, statements, admissions and answers were voluntary. Rogers does not argue that his statements were involuntary. For the reasons stated in Judge Graham's R&R, the Court adopts Judge Graham's finding that Rogers' statements were voluntary.

## B. Miranda and the Public Safety Exception

Rogers' pre-Miranda statements present a more complicated issue. As a general rule, the Government may not introduce at trial any statement of a defendant obtained from a custodial interrogation unless the individual was first advised of his Miranda rights; these advisories are required "to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." R&R at 12-13 (citing Maryland v. Shatzer, 559 U.S. 98, 103 (2010), and quoting Miranda, 384 U.S. at 467); see United States v. Patane, 542 U.S. 630, 636-37 (2004) (Miranda warnings are not constitutionally required but are a judicially-created

4

prophylactic measure intended to protect an individual's privilege against self-incrimination).

In New York v. Quarles, the United States Supreme Court recognized an exception to Miranda's advice-of-rights requirement when "police officers ask questions reasonably prompted by a concern for the public safety." 467 U.S. 649, 656 (1984). The underlying rationale for the exception is that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657. In Quarles, an officer asked the suspect "only the question necessary to locate the missing gun before advising [the suspect] of his rights." Id. at 659. The Court acknowledged that "in recognizing a narrow exception to the Miranda rule . . . we lessen the desirable clarity of that rule." Id. But, the Court believed that police officers could recognize the difference between when exigent circumstances warrant bypassing Miranda warnings in favor of immediately securing the public safety, and when their questions were "designed solely to elicit testimonial evidence from a suspect." Id.

## C. Pre-Miranda Interview

Judge Graham recommends denying Rogers' Motion to Suppress his May 3, 2013 statements in its entirety. Rogers objects, arguing his forty-minute initial interview does not fall under the public safety exception to Miranda.

The Government's interest in public safety is circumscribed by the exigencies of the situation. The Court agrees with Judge Graham that to ensure the safety of officers at the scene and the surrounding community, Agent Ball needed immediate information about the nature and quantity of the explosive and incendiary devices, how they were made, how they were intended to be detonated, and whether any other devices, components, or chemicals existed on the

property or elsewhere. Questioning related to the alleged plot to strike at various Montevideo locations and to law enforcement's dismantling of potentially dangerous explosive devices was appropriate for public safety reasons. See United States v. Abdulmutallab, No. 10-20005, 2011 WL 4345243, at *5 (E.D. Mich. Sept. 16, 2011) (finding the public safety exception applied to a fifty-minute interrogation aimed "to identify any other attackers or other potentially imminent attacks—information that could be used in conjunction with other U.S. government information to identify and disrupt such imminent attacks before they could occur."). In United States v. Williams, the Eighth Circuit found a suspect's statements admissible under Quarles, explaining

> "Although [Defedants'] hands were cuffed behind his back when the officers asked him if they needed to be aware of anything else, the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons[] were present in the apartment . . . ."

181 F.3d 945, 953-54 (8th Cir. 1999). Similarly here, the officers had partially corroborated evidence that Rogers was involved in making explosives and were concerned Rogers and the Black Snake Militia were willing to use these explosives the next day. Even though Rogers and members of his family were accounted for, officers could not be sure that all the devices were accounted for or that other members of the group might still be at large. Devices like Rogers' homemade explosives are particularly dangerous to the public and to the officers attempting to defuse them. Agent Ball's questioning of Rogers, showing Rogers photos of the devices found, relaying information from Rogers back to the bomb technicians, and inquiring about other devices that the officers might find or other people who might use those devices all reasonably fall within the public safety exception.

At the suppression hearing, Agent Ball described why he felt the public safety exception

6

to Miranda was applicable to this case and his view of what the scope of the questioning of Rogers should be:

> We utilized the public safety exception, specifically because we had solid information that a plot was in the works, that an individual had weapons, explosives, and knowledge, wherewithal, those things, in order to commit a plot. When we arrived at the scene, we found weapons and explosives, incendiary devices consistent with what we found. So, at that time the bigger, overriding factor of what we're doing that day was to establish the -- how many devices are there, how many weapons are there, what's out there, is he capable of committing these sort of acts, are there any other co-conspirators, types of devices, how are they triggered, what are the mechanisms, those sorts of things.

R&R 8-9 (citing Mot. Hr'g Tr. 25:11-22). However, Agent Ball veered into a line of questioning that does not fit even within his own description of topics to explore with Rogers to protect public safety. He posed questions to Rogers about when he handled particular firearms explaining to Rogers that fingerprints cannot be dated. Gov't Ex. 3 at 00000123. He honed in on when Rogers may have handled the gun in relation to when he was placed on probation for a prior offense. This line of questioning cannot reasonably be found to be motivated by exigent circumstance or the public safety. Rather, the questions are an experienced investigators' effort to have Rogers admit a key element of possession of a firearm by a convicted felon, an offense Agent Ball undoubtedly anticipated would be charged against Rogers.

Agent Ball's line of questioning about Rogers' fingerprints and handling of guns at the Benson Road Property was not motivated by exigent circumstances. The firearms had been secured and all persons found at the search site had been detained. Rogers was handcuffed and in custody at the police station. To allow "public safety" questioning to expand to include nailing down by admission elements of an anticipated charging offense would allow the public safety exception to swallow the Miranda rule.

7

In firearms cases where the public safety exception has been applied, including <u>Quarles</u>, the officers conducting the arrest asked questions that would protect them and the public from immediate danger or from a weapon in the area of the arrest. See <u>United States v. Knox</u>, 950 F.2d 516 (8th Cir. 1991); <u>United States v. Luker</u>, 395 F.3d 830, 833-34 (8th Cir. 2005). In this case, the firearms at the Benson Road Property presented no danger to the police officers or the public in general because all the firearms Agent Ball asked about were already secured by police.

Suppression of Rogers' statements related to the temporal relationship of handling of firearms does not run afoul of the admonition against requiring "precision crafting," <u>United States v. Newton</u>, 369 F.3d 659, 678 (2nd Cir. 2004), or the Eighth Circuit's caution against "conditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions," <u>Williams</u>, 181 F.3d at 953, n.13. It is not the phrasing of the questions about the firearms which is offensive to the <u>Miranda</u> requirement, instead it is the topic of the questions at issue here and the lack of nexus between the questions and the exigent circumstances. To allow wide latitude for an investigator to pose questions related to elements of offenses rather than public safety issues is contrary to the Supreme Court's description of <u>Quarles</u> as creating a narrow exception to the <u>Miranda</u> rule. Statements of Rogers relating to his own possession of firearms which were made prior to his being advised of his <u>Miranda</u> rights will be inadmissible at trial.

**D. Post-<u>Miranda</u> Interview**

Rogers argues that the post-<u>Miranda</u> portion of the interrogation is inadmissible because it violates the "question first" interrogation process prohibited in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). The Court disagrees.

8

In Seibert, a divided Supreme Court rebuked a two-step interrogation strategy in which the interrogating officer deliberately obtained an unwarned confession, then advised the suspect of her Miranda rights and elicited a second confession covering the same ground. Id. at 604. In the Eighth Circuit, the courts treat "Justice Kennedy's concurrence as controlling since it provided the fifth vote necessary for a majority and since it was decided on narrower grounds than the plurality opinion." United States v. Torres-Lona, 491 F.3d 750, 758 (8th Cir. 2007). Justice Kennedy's opinion confirmed that where there has been no calculated effort to circumvent Miranda requirements with a two step interrogation strategy, a post warning statement is admissible so long as it was knowingly and voluntarily made. Id. (finding that the voluntariness of a suspect's statement is governed by Oregon v. Elstad, 470 U.S. 298 (1985)). In this case, Agent Ball was at least initially motivated to use the public safety exception by the dangerous nature of the suspected plot and the explosives found on the Benson Road Property. Notwithstanding Agent Ball's distraction from his task and the dwindling exigencies of the situation, the Court agrees with Judge Graham that Agent Ball did not employ a calculated strategy to circumvent Miranda. See United States v. Walker, 518 F.3d 983 (8th Cir. 2008) and United States v. Wise, 588 F.3d 531, 536 (8th Cir. 2009).

The Court also agrees with Judge Graham's findings on voluntariness of Rogers' post-Miranda statement:

> Here, there is no evidence that Rogers was intimidated, coerced, or deceived at any point during the interrogation. Agent Ball treated Rogers courteously, and the questions he asked were clear and straightforward. Rogers' demeanor and responses confirm that he was not intimidated, tricked, or coerced. The Court finds that Rogers' decision to waive his Miranda rights was a free and deliberate choice.
>
> Rogers is an intelligent adult and has experience with the criminal justice system. Before May 3, 2013, he had heard Miranda warnings twice before and waived his

9

rights both times. He also indicated to Agent Ball that he understood his Miranda rights. Throughout the interview, Rogers was calm, articulate, engaged, responsive, and coherent. He did not appear under the influence of drugs or alcohol, and he was not visibly fatigued or upset. The Court finds that Rogers was fully aware of the nature of his rights and the consequences of abandoning them.

R&R at 18-19. Therefore, Rogers' post-Miranda statements will be admissible at trial.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the Objection of Defendant Buford Braden Rogers [Docket No. 74] is **SUSTAINED IN PART** and **OVERRULED IN PART**.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: December 6, 2013.